**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

BRYAN F. JENNINGS,

       Petitioner,

v.                                 CASE NO.  5:02cv174-RH

JAMES V. CROSBY,

       Respondent.

_____/

## ORDER DENYING PETITION

By petition for writ of habeas corpus, petitioner Bryan F. Jennings challenges

his state court conviction and sentence of death.  I deny the petition.

## I.  FACTS & PROCEDURAL HISTORY

***Facts.***  The relevant facts are set out in the trial court's sentencing order, as

quoted by the Florida Supreme Court opinion addressing Mr. Jennings' first round

of postconviction claims:

> In the early morning hours of May 11, 1979, Rebecca Kunash was asleep
> in her bed.  A nightlight had been left on in her room and her parents were
> asleep in another part of the house.  The Defendant went to her window and
> saw Rebecca asleep.  He forcibly removed the screen, opened the window,
> and climbed into her bedroom.  He put his hand over her mouth, took her to

his car and proceeded to an area near the Girard Street Canal on Merritt Island.  He raped Rebecca, severely bruising and lacerating her vaginal area, using such force that he bruised his penis.  In the course of events, he lifted Rebecca by her legs, brought her back over his head, and swung her like a sledge hammer onto the ground fracturing her skull and causing extensive damage to her brain.  While she was still alive, Defendant took her into the canal and held her head under the water until she drowned.  At the time of her death, Rebecca Kunash was six (6) years of age.

*Jennings v. State*, 583 So. 2d 316, 318 (Fla. 1991).[1]

 ***State Proceedings.***  Mr. Jennings was tried in the Circuit Court of Brevard County and was convicted of first-degree murder, kidnaping, and sexual battery.  He was sentenced to death.  *See Jennings v. State*, 413 So. 2d 24, 25 (Fla. 1982) (per curiam) (*Jennings I*).  On direct appeal of those convictions, the Florida Supreme Court held that Mr. Jennings was deprived of a fair trial because his public defender refused to cross-examine a critical witness, believing that because the witness was represented by the public defender's office, cross-examination would violate the code of professional responsibility.  *See id.* at 25-26.  The Florida Supreme Court vacated the verdict and sentence.  It remanded the case for a new trial.  *See id.* at 27.

 Mr. Jennings was retried in the Circuit Court of Brevard County and was

---

 [1] The state court's factual determinations "shall be presumed correct" and a petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  18 U.S.C. §2254(e)(1).  Mr. Jennings no longer enjoys a presumption of innocence, *see Herrera v. Collins*, 506 U.S. 390, 399, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), nor has he ever claimed innocence.

convicted of first-degree murder, kidnaping, sexual battery, burglary of an occupied dwelling with assault, and aggravated battery.  Again he was sentenced to death.  *Jennings v. State*, 453 So. 2d 1109, 1111 (Fla. 1984) (*Jennings II*).  On direct appeal Mr. Jennings argued, among other things, that a confession he gave police shortly after the murder was obtained in violation of his Fifth and Fourteenth Amendment rights, as enunciated in *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).  The Florida Supreme Court rejected this and his other claims, and it affirmed his convictions and sentence.  *See Jennings II*.  The United States Supreme Court vacated the judgment of conviction based upon the admission of Mr. Jennings' confession.  *See Jennings v. Fla.*, 470 U.S. 1002, 105 S. Ct. 1351, 84 L. Ed. 2d 374 (1985) (mem.).  The Florida Supreme Court then remanded the case for a new trial.  *See Jennings v. State*, 473 So. 2d 204 (Fla. 1985).

Following a change of venue, Mr. Jennings' third trial commenced in Bay County, Florida, in March 1986.  He was convicted of first-degree murder, two counts of first-degree felony murder, kidnaping with intent to commit sexual battery, sexual battery, and burglary.[2]  Following an advisory jury verdict voting 11 to one in favor of death, Mr. Jennings was again sentenced to death.  *See*

---

[2] Unless otherwise noted, mention throughout this order of Mr. Jennings' "trial" refers to his third trial in 1986.

*Jennings v. State*, 512 So. 2d 169, 171, 173 (Fla. 1987) (per curiam) (*Jennings III*).³  The convictions and death sentence were affirmed on direct appeal.  *See id.* at 176.  The Florida Supreme Court did, however, reverse Mr. Jennings' sentences with respect to the crimes of sexual battery and kidnaping with intent to commit sexual battery because the trial court failed to certify him as a mentally disordered sex offender with respect to those crimes.  *See id.* at 175-76.

Mr. Jennings then filed for postconviction relief in state court.  His motion was denied, and the denial was affirmed on appeal, except that the Florida Supreme Court agreed that Mr. Jennings was entitled to see portions of the state's files as public records.  *See Jennings v. State*, 583 So. 2d 316 (Fla. 1991) (per curiam) (*Jennings IV*).  Accordingly, the Florida Supreme Court extended the limitations period for Mr. Jennings to raise postconviction arguments that might arise upon review of the additional records.  *See id.* at 319.

Mr. Jennings did raise a number of such claims.  Following a summary judgment hearing and interlocutory appeal in 1994, and an evidentiary hearing in October 1997, the trial court denied all relief.  Mr. Jennings appealed and the Florida Supreme Court affirmed.  *See Jennings v. State*, 782 So. 2d 853 (Fla. 2001) (*Jennings V*).

**Federal Proceedings.**  Mr. Jennings filed the instant federal petition under 28

_____

³ Mr. Jennings was not sentenced for the two convictions of felony murder.  *See Jennings III*, 512 So. 2d at 175 n.3.

U.S.C. §2254.  Briefing was ordered with respect to jurisdiction and venue.  The

state moved to dismiss, and the motion was denied.  The action was held in

abeyance pending the outcome of the state habeas petition Mr. Jennings was

pursuing in the wake of *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed.

2d 556 (2002).  The state habeas petition was denied and this action resumed.  The

state responded to the petition, and Mr. Jennings replied.  The petition is ripe for

adjudication.

## II.  <u>STANDARD OF REVIEW</u>

The petition was filed after enactment of the Anti-Terrorism and Effective

Death Penalty Act of 1996 ("AEDPA") and is therefore subject to its terms.  *See,*

*e.g.*, *(Michael) Williams v. Taylor*, 529 U.S. 420, 429, 120 S. Ct. 1479, 146 L. Ed.

2d 435 (2000) ("Petitioner filed his federal habeas petition after AEDPA's

effective date, so the statute applies to his case.") (citing *Lindh v. Murphy*, 521

U.S. 320, 326-27, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997)).

Under chapter 153, as amended by AEDPA, a writ can issue only if the state

court's ruling "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States"

or "was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C. §2254(d)(1)-(2);

*(Terry) Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389

(2000).  AEDPA "plainly sought to ensure a level of 'deference to the

determinations of state courts,' provided those determinations did not conflict with

federal law or apply federal law in an unreasonable way."  *(Terry) Williams*, 529

U.S. at 386 (quoting H.R. Conf. Rep. No. 104-518, at 111 (1996)).

   ***"Contrary To."***  A state court decision "is 'contrary to' clearly established

federal law if either (1) the state court applied a rule that contradicts the governing

law set forth by Supreme Court case law, or (2) when faced with materially

indistinguishable facts, the state court arrived at a result different from that reached

in a Supreme Court case."  *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir.

2001).[4]  *See also Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d

914 (2002); *(Terry) Williams*, 529 U.S. at 405.

   ***"Unreasonable Application."***  A Supreme Court precedent has been

"unreasonably applied" if "it identifies the correct legal rule from Supreme Court

case law but unreasonably applies that rule to the facts of the petitioner's case [or]

if a state court unreasonably extends, or unreasonably declines to extend, a legal

_____

   [4] Although only Supreme Court precedent can clearly establish the law for
post-AEDPA habeas purposes, Eleventh Circuit case law may "demonstrate some
applications of the relevant Supreme Court precedent that we [the Eleventh Circuit]
believe are among the reasonable applications." *Van Poyck v. Fla. Dep't of Corr.*,
290 F.3d 1318, 1322 n.4. (11th Cir. 2002).  In other words, Eleventh Circuit
decisions may be cited as exemplifying proper application of a relevant governing
Supreme Court standard.

principle from Supreme Court case law to a new context." *Putman*, 268 F.3d at

1241.  The test is objective.  *(Terry) Williams*, 529 U.S. at 409 ("Stated simply, a

federal habeas court making the 'unreasonable application' inquiry should ask

whether the state court's application of clearly established federal law was

objectively unreasonable.").  Accordingly, "a federal habeas court may not issue

the writ simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or

incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411; *see*

*also Bell*, 535 U.S. at 694 (same).

   ***"Unreasonable Determination."***  Factual determinations by the state courts are

"presumed to be correct, and the petitioner can rebut this presumption only by clear

and convincing evidence." *Harrell v. Butterworth*, 251 F.3d 926, 930-31 (11th

Cir. 2001) (citing *Mincey v. Head*, 206 F.3d 1106, 1130 n.58 (11th Cir. 2000)).

Therefore, Mr. Jennings must prove by clear and convincing evidence the

unreasonableness of any challenged state court factual determinations.  However,

this statutory presumption of correctness "applies only to findings of fact made by

the state court, not to mixed determinations of law and fact." *Id.* at 836.  The

presumption of correctness afforded factual findings extends to both trial and

appellate state courts.  28 U.S.C. §2254(e)(1); *Bui v. Haley*, 279 F.3d 1327, 1334

(11th Cir. 2002) (citing *Sumner v. Mata*, 449 U.S. 539, 547, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981)).

## III.  EVIDENTIARY HEARING

An evidentiary hearing is not necessary in this case.  Section  2254(e)(2) states that an evidentiary hearing may not be held if the petitioner has failed to develop the factual basis of his claim in state court proceedings (except under enumerated exceptional circumstances).  A petitioner "cannot be said to have 'failed to develop' relevant facts if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings."  *Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002) (citing *(Michael) Williams*, 529 U.S. at 437).  Mr. Jennings does not claim that he was denied the opportunity to develop the record. Indeed, the Florida Supreme Court extended the limitations period to afford him an opportunity to do just that.  *See Jennings IV*, 583 So. 2d at 319.  The trial court conducted postconviction evidentiary hearings in 1989 and 1997.  (F22 & F28.)[5] Respondent does not argue, and there is no record indication, that Mr. Jennings

---

[5] Throughout this order, record citations will refer to the folder number (as filed by respondent), followed where appropriate by the relevant page number. Further designations of documents will be included where helpful.  The petition will be cited as "Pet."  The response will be cited as "Resp."  Petitioner's reply to the response will be cited as "Reply."

failed to develop the relevant facts in the state court litigation.

Section 2254(e)(2) sets forth when a hearing may *not* be held; but even if a hearing is not barred by §2254(e)(2), it remains inappropriate "if such a hearing would not assist in the resolution of [the] claim." *Breedlove*, 279 F.3d at 960 (citation omitted).  Stated affirmatively, "'a habeas petitioner is entitled to an evidentiary hearing if he or she alleges facts that, if proved at the hearing, would entitle petitioner to relief.'"  *Id.* (quoting *Meeks v. Singletary*, 963 F.2d 316, 319 (11th Cir. 1992)).  But in a post-AEDPA world, whether petitioner would be entitled to relief is considered in light of the heavy presumptions in favor of sustaining the state court adjudication.  Although the standard for granting the hearing remains the same, the measure underlying that standard has changed.

## IV. <u>ANALYSIS</u>

### A.  <u>CLAIM I</u>: *Brady*

Mr. Jennings claims that his constitutional rights were violated by the state's failure to disclose evidence, contrary to *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), which held that suppression of evidence materially favorable to the accused violates due process.  Alternatively, he asserts that his attorney's failure to discover evidence amounted to ineffective assistance of

counsel in violation of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80

L. Ed. 2d 674 (1984).  This claim is unfounded.

### A.1.  <u>Claim I: The *Brady* & *Strickland* Standards of Review</u>

***The* Brady *Standard.***  In *Brady*, the Supreme Court held that "the suppression

by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material to guilt or to punishment . . . ."  373 U.S. at

87.  Evidence is material

> only if there is a reasonable probability that, had the evidence been disclosed
> to the defense, the result of the proceeding would have been different.  A
> "reasonable probability" is a probability sufficient to undermine confidence
> in the outcome.

*United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481

(1985).  Both exculpatory and impeachment evidence are within *Brady*'s ambit.

*See id.* at 676.

In *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995),

the Supreme Court clarified the materiality standard, setting out four important

aspects.  First, a petitioner need not prove by a preponderance that disclosure of the

evidence would have resulted in an acquittal, but whether, in the absence of the

*Brady* material, "he received a fair trial, understood as a trial resulting in a verdict

worthy of confidence." *Id.* at 434.  Second, a petitioner must show "that the

favorable evidence could reasonably be taken to put the whole case in such a

different light as to undermine confidence in the verdict."  *Id.* at 434-35.  Third, if a

reviewing court finds a *Brady* violation, it may not deem the violation harmless

error.  *Id.* at 435.  Fourth, in determining materiality, the evidence is considered

collectively, not item by item.  *Id.* at 436.  In sum, "[t]here are three components of

a true *Brady* violation: [1] The evidence at issue must be favorable to the accused,

either because it is exculpatory, or because it is impeaching; [2] that evidence must

have been suppressed by the State, either willfully or inadvertently; and [3]

prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.

Ct. 1936, 144 L. Ed. 2d 286 (1999).

   ***The* Strickland *Standard.***  The standard for proving ineffective assistance was

well-established at the time of Mr. Jennings' third trial.  *See Strickland v. Wash.*,

466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Broadly speaking, a

petitioner "must show that his lawyer's performance fell below an 'objective

standard of reasonableness' and that the lawyer's deficient performance prejudiced

the petitioner."  *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir.

2002) (quoting *Strickland*, 466 U.S. at 688).  A "strong presumption" exists "that

counsel's performance was reasonable and that counsel made all significant

decisions in the exercise of reasonable and professional judgment."  *Id.* (quoting

*Chandler v. U.S.*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc)).

More specifically, Mr. Jennings can satisfy *Strickland*'s ineffective assistance standard only if he specifically established (1) "that no objectively competent lawyer would have taken the action that his lawyer did take," *Van Poyck*, 290 F.3d at 1322 (citing *Chandler*, 218 F.3d at 1315), and (2) "that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given adequate assistance." *Id.* at 1323 (citing *Strickland*, 466 U.S. at 693); *see also Bell*, 535 U.S. at 695 (reiterating the need for "proof of both deficient performance and prejudice to the defense").

Under AEDPA, however, the question here is not whether the defendant "would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance . . . ." *Bell*, 535 U.S. at 698-99. Rather, Mr. Jennings "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner" or that the state court decided this case differently than the Supreme Court on materially indistinguishable facts and thus was "contrary to" the *Strickland* standard. *Id.* at 699.

***Applying the Two Standards.*** The *Brady* materiality standard and the *Strickland* prejudice standard are identical. *See, e.g., Bagley*, 473 U.S. at 682 (adopting the *Strickland* prejudice standard for determining *Brady* materiality);

*accord Brown v. Head*, 272 F.3d 1308, 1316 (11th Cir. 2001) ("The prejudice component of an ineffective assistance claim and the materiality component of a *Brady* claim both require the same thing . . . a reasonable probability of a different result in the proceeding."). Therefore, failure to prove *Brady* materiality forecloses a *Strickland* claim based upon counsel's failure to discover the evidence in question.

### A.2.  <u>Claim I: The Individual Claims</u>

***Prosecutor's Memorandum.***  Three witnesses, who were housed with Mr. Jennings in the Brevard County Jail in June 1979, testified at trial that Mr. Jennings confessed to the murder—Allen Kruger, Clarence "Rick" Muszynski, and Billy Crisco.  Mr. Muszynski and Mr. Kruger heard one confession in the cell they shared with Mr. Jennings.  (F5 at 623-47; F6 at 907-20.)  Mr. Crisco approached Mr. Jennings independently and Mr. Jennings gave him a nearly identical confession.  (F6 at 936-46.)

Postconviction discovery yielded a memorandum by assistant state attorney Michael Hunt containing notes of his interview with Allen Kruger on May 20, 1982.[6]  Mr. Jennings raised four related points regarding the memorandum:  (1)

---

[6] Mr. Hunt prosecuted Mr. Jennings' second trial.  Despite the numerous occasions on which the memorandum was discussed and cited, a copy apparently does not exist in this record.  No one disputes its relevant contents.

that it indicated Mr. Kruger read other statements to enhance his memory with respect to the victim's age (F31, Appellant's Brief at 55); (2) that it was relevant to whether the victim was conscious during the episode (*id.*); (3) that it indicated Mr. Muszynski was an agent of the state when he received Mr. Jennings' confession (*id.* at 55-56); and (4) that it could have been used to undermine the state's position as to the order in which Mr. Kruger and Mr. Muszynski approached the state.  (*Id.* at 54.)

The Florida Supreme Court correctly identified and applied *Brady* as the controlling standard, addressing each component of the claim in detail in upholding the trial court's denial of postconviction relief.  *See Jennings V*, 782 So. 2d at 856-58.  Mr. Jennings has cited no Supreme Court case that reached a different result on materially indistinguishable facts and thus the ruling cannot be deemed contrary to federal law.  He has not attempted to refute the Florida Supreme Court's detailed findings with respect to the prosecutor's memorandum, and he has not argued that it reached any unreasonable determination on this score. His initial petition instead addresses the issue de novo, arguing it just as he argued it in state court, rather than addressing potential inadequacies in the state court adjudication.  (Pet. at 25-28.)[7]  With respect to the memorandum, Mr. Jennings has

---

[7] Mr. Jennings' reply does argue that the Florida Supreme Court failed to employ a cumulative *Brady* analysis, thus unreasonably applying *Brady*. (Reply at

failed to establish any entitlement to habeas relief.

    ***Taped Statement of Judy Slocum.***  Mr. Jennings next addresses the state's failure to disclose the taped statement of Judy Slocum obtained by the sheriff's department on June 6, 1979.  In brief, Ms. Slocum stated that at approximately 1:15 a.m. on the morning of the murder, she drove Mr. Jennings from a bar to his home so he could change pants and then drove him back to the bar.  (Pet. at 28-29; F21 Appx. to Mtn. to Vacate, Exh. 1.)  Ms. Slocum said that he needed her to drive because "he knew he had too much to drink" and that when she left the bar at 2:30 a.m., he was "pretty much loaded."  (*Id.* at 30; F29 at 246-47) (stipulating that the word "pretty" was inadvertently omitted from the transcript).

    Mr. Jennings contends that Ms. Slocum's statement would have been used at trial and during the penalty phase.  Defense counsel could have used it to "demonstrate Mr. Jennings' extremely intoxicated condition" to the jury, to corroborate his alleged intoxication to the mental health experts, and to impeach the state's experts who testified that there was no evidence of intoxication.  (*Id.* at 32.)  He also claims the statement could have been used to impeach and to undermine the credibility of Mr. Muszynski and Mr. Kruger because Mr. Jennings' intoxication was allegedly inconsistent with the level of detail expressed in his

---

3-6.)  This argument is unavailing, as discussed below following the item-by-item discussion of the evidence.

confession to them.  Finally, he says the statement would have established

mitigation and negated aggravating circumstances.  (*Id.* at 32-33.)

The Florida Supreme Court deemed this aspect of the *Brady* claim procedurally

barred because it had been raised and denied in Mr. Jennings' prior postconviction

motion and appeal.  *See Jennings V*, 782 So. 2d at 858.  This issue is preserved for

federal habeas review.  *See Davis v. Singletary*, 119 F.3d 1471, 1479 (11th Cir.

1997) ("Once a state supreme court on direct review has . . . based its disposition

solely on a rejection of the merits of a claim, no amount of procedural bar holding

as to that claim in further proceedings will suffice to bar the claim from federal

habeas review.").  The claim is without merit, however.

In the earlier proceeding, the Florida Supreme Court quoted at length and

adopted the trial court's meticulous refutation of this claim.  *See Jennings IV*, 583

So. 2d at 318-19.  The trial court noted several deficiencies in the argument:  Mr.

Jennings knew about Ms. Slocum and her potential testimony; the defense was

aware of witness Patrick Clawson's statement that Mr. Jennings had a girl drive

him home because he was too drunk; defense counsel had the statement of, but

declined to call, Floyd Canada, who drank with Mr. Jennings hours before the

murder; other witnesses could have testified to Mr. Jennings' inebriation, but did

not because such a theory simply was not the thrust of his defense.  *See id.* (quoting

F22, Order [on Mtn. for Reh'g]).  Indeed, Mr. Jennings' trial counsel, Mr. Howard, in addressing the Slocum interview during Mr. Jennings' 1997 postconviction evidentiary hearing, stated that he "made a tactical decision not to pursue a voluntary intoxication defense."  (F29 at 176.)  When asked whether having the Slocum interview would have changed that tactical decision he responded, "I don't know for sure. . . . I did not feel then, and still do not feel that an intoxication defense . . . would have been a strong defense . . . ."  (*Id.* at 178.)

Mr. Jennings approaches the issue de novo in this court.  He does not assail the state court adjudication of the claim, except that his Reply attacks the Florida Supreme Court's purported failure to engage in a cumulative *Brady* analysis, an issue addressed below.  Mr. Jennings is not entitled to habeas relief as to the Slocum interview.

***Muszynski Letter.***  A letter written on October 22, 1985, by Mr. Muszynski, one of the cellmates to whom  Mr. Jennings confessed in 1979, was also found in postconviction discovery.  The letter, which was addressed to the state attorney in Titusville, Florida, said:

> I was interviewed and left a calling card by Wayne D. Porter, Investigator for your Office in reference to a murder case of a six year old child which had been sexually abused.
>
> In order for me to be able to communicate with your office for any

possible assistance you may require of me I would appreciate if you would have an attorney appointed for me so that I will not infringe on any of my Fifth Amendment rights, being a layman, and that all discussions would be handed through said attorney representing me.

Hoping this arrangements [sic] suits your purposes; I remain

Sincerely yours,

/s/ Clarence Muszynski

Clarence Muszinski [sic]

(F21 Appx. to Mtn. to Vacate, Exh. 3.)  Mr. Jennings claims that the letter could be used to impeach Mr. Muszynski because it "request[ed] a price for his cooperation and testimony against Mr. Jennings.  The price was an appointment of attorney to represent him[.]" (Pet. at 33.)

As with the Slocum interview, the Florida Supreme Court deemed this aspect of Mr. Jennings' *Brady* claim procedurally barred because it had been raised and denied in his prior postconviction motion and appeal.  *See Jennings V*, 782 So. 2d at 858.[8]  Despite the procedural bar holding, the court noted that the letter "does not constitute *Brady* material because it does not establish a reasonable probability of achieving a different result" since it merely contained "a request for counsel to avoid incriminating himself."  *Id.* at 858 n.6.

_____

[8] In the earlier proceeding, the Florida Supreme Court rejected the issue without discussion.  *See Jennings IV*, 583 So. 2d at 322.

Mr. Jennings has failed to demonstrate that this determination is contrary to federal law or objectively unreasonable.  Indeed, the court's interpretation of the letter is reasonable.  He is not entitled to habeas relief on *Brady* grounds with respect to Mr. Muszynski's letter.

***Other Suspects.***  The final aspect of Mr. Jennings' *Brady* claim involves the state's failure to produce a series of law enforcement field notes generated during the homicide investigation.  The notes reveal five suspicious person reports received during the investigation.  (F28 at 538-47.)  As noted in the trial court's order denying postconviction relief (quoted by the Florida Supreme Court), Mr. Jennings's trial counsel, Mr. Howard, testified that:

> with that one exception, none of the other field interrogation cards gave you enough or any substance to really relate it to this particular offense. . . . The relevance or actually the usefulness, I'll put it that way, to the defense [is as a] phantom suspect.

(F29 at 236.)  The "one exception" was a report that on the day before the murder, a man claiming to have escaped from an asylum accosted a 20-year-old woman and kept "talking about funny things."  (F28 at 545.)  Mr. Howard admitted that there was a "high likelihood" that he "might not have been successful" in admitting any evidence on this point.  (F29 at 235.)

Against this backdrop, the Florida Supreme Court concluded: "Appellant's

reliance on the forgoing evidence to create a 'phantom suspect' rather than present admissible evidence that someone else committed the crime in question does not satisfy his burden of establishing a reasonable probability of a different result." *Jennings V*, 782 So. 2d at 859.

Mr. Jennings has failed to demonstrate that the Florida Supreme Court's determination is contrary to, or an unreasonable application of, federal law.  Mr. Jennings posits that the Florida Supreme Court unreasonably applied the *Kyles* decision because it "did not consider, as required, the attack on the good faith of law enforcement's investigation arising from the series of nondisclosures."  (Reply at 11.)  But, had the field notes been turned over in the first instance, there would have been no lack of good faith to prove.[9]  Otherwise, Mr. Jennings attacks only the state court's ostensible failure to consider this *Brady* evidence cumulatively with the rest.  I will address that issue next.

### A.3.  Claim I: The *Brady* Evidence Considered Cumulatively

Mr. Jennings is correct that, in determining materiality under *Brady*, the evidence must be considered collectively.  *See Kyles*, 514 U.S. at 436.  Mr. Jennings repeatedly argues that the Florida Supreme Court unreasonably applied

---

[9] In the portion of *Kyles* cited by Mr. Jennings, the Court refers to a situation in which nondisclosed evidence could have been used to support an argument that the defendant was framed—a situation not present here.  *See Kyles*, 514 U.S. at 449 n.19.

federal law by failing to engage in a cumulative analysis of the nondisclosed

evidence.  (Pet. at 34 ("A cumulative analysis [of the Muszynski letter] with the

other *Brady* material was not conducted.")); Reply at 5 ("[T]he Florida Supreme

Court failed to consider this [Kruger notes] nondisclosure cumulatively . . ."); *id.* at

8 ("The Florida Supreme Court's application of a procedural bar in 2001 precluded

cumulative consideration of all the nondisclosures of exculpatory evidence as

required by *Kyles v. Whitley*."); *id.* at 9 ("[T]he Florida Supreme Court did not

conduct a cumulative analysis . . . ."); *id.* at 11 ("The cumulative and synergistic

effect of the nondisclosures was ignored.").  In taking this position, Mr. Jennings is

mistaken.  The Florida Supreme Court stated in *Jennings V*:

> Overall, the cumulative effect of the alleged *Brady* violations does not
> establish *Brady* materiality.  The notes concerning the Kruger interview do
> not undercut confidence in the verdict.  Moreover, the Slocum tape,
> Muszynski letter, and the "other suspects" claim do not require relief
> individually or collectively.

782 So. 2d at 862 (citations omitted).  Thus, the Florida Supreme Court did

conduct a cumulative analysis, which included both the Muszynski letter and

Slocum interview, which were considered in 1991 but procedurally barred from

reconsideration on the merits in *Jennings V*.  Mr. Jennings takes no issue with the

court's cumulative analysis and thus fails to establish any entitlement to habeas

relief.  He would not prevail in any event, for the Florida Supreme Court did not

unreasonably apply, or achieve a result contrary to, clearly established federal law.

Thus, Mr. Jennings' claims, individually and collectively, do not warrant relief

under the deferential review mandated by AEDPA.

This is more so given the overwhelming evidence of Mr. Jennings' guilt.  While

"none of the *Brady* cases has ever suggested that sufficiency of evidence (or

insufficiency) is the touchstone,"  *Kyles*, 514 U.S. at 435 n.8, it is not irrelevant.

As a practical matter, there is no other way to determine whether there exists any

reasonable probability that disclosure would have yielded a different verdict.  The

Supreme Court recognized as much in *Kyles* when it observed that the question is

whether, in the absence of the *Brady* material, the defendant "received a fair trial,

understood as a trial resulting in a verdict worthy of confidence," 514 U.S. at 434,

and by its holding that a petitioner must show " the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict."  *Id.*

The evidence against Mr. Jennings was vast, including three witnesses to whom

he confessed.  While his *Brady* claim is premised on the notion of impeaching Mr.

Kruger and Mr. Muszynski, it would not bar the fact of his confession to them and

would not affect Mr. Crisco's testimony.  Additionally, Mr. Jennings' fingerprints

were found on the bedroom window; there was testimony that a nearby shoe print was consistent with his shoes; there was evidence that his clothes were wet on the morning of the crime; and he had abrasions on his penis.  With all this evidence, it is unreasonable to believe that introducing the nondisclosed evidence would put the case in such a different light as to undermine confidence in the verdict.  Mr. Jennings has failed to demonstrate any entitlement to habeas relief under *Brady*.

   ***Ineffective Assistance.***  As noted at the outset, Mr. Jennings argues that to the extent a *Brady* violation might not be found due to lack of trial counsel's diligence, "the claim is converted to an ineffective assistance of counsel claim."  (Pet. at 35.) No substantive allegations are made in this respect.  In any event, Mr. Jennings' failure to demonstrate *Brady* materiality is fatal to any potential ineffective assistance claim based upon failure to discover the evidence.  *See, e.g.*, *Brown v. Head*, 272 F.3d 1308, 1316 (11th Cir. 2001) ("The prejudice component of an ineffective assistance claim and the materiality component of a *Brady* claim both require . . . a reasonable probability of a different result in the proceeding.").


### A.4.  <u>Claim I: Conclusion</u>

   Mr. Jennings has failed to demonstrate that the Florida Supreme Court reached a result that is objectively unreasonable or contrary to clearly established federal

law on his *Brady* or ineffective assistance of counsel claims.   Nor has he proved

(or even alleged) that the state court adjudication rests upon an unreasonable fact

determination.  Claim I is unfounded.

## B.  CLAIM II: The *Strickland* Claim

Mr. Jennings next claims that his trial attorney, Mr. Howard, rendered

ineffective assistance in violation of *Strickland*.  Specifically, he claims that Mr.

Howard failed to follow up with certain witnesses whose testimony would have

produced a different outcome, particularly in the penalty phase of trial.[10]  The bulk

of the evidence pertains to Mr. Jennings' intoxication on the morning of the crime,

proof of which he asserts could have precluded one or more aggravating

circumstances.  This claim is unfounded.

### B.1  Claim II: The *Strickland* Standard of Review

The standard for proving ineffective assistance is set out above.  *See* Part

III.A.4; *Strickland*, 466 U.S. at 668.  There is no dispute that the Florida Supreme

Court correctly identified *Strickland* as the controlling standard, and Mr. Jennings

does not claim that the state court ruling was based upon an unreasonable fact

---

[10] As noted previously, capital trials in Florida are divided into a guilt phase (by which the jury determines guilt or innocence) and the penalty phase (by which it recommends a sentence to the sentencing judge).

determination.  Nor does he claim that that court reached a result contrary to that of the United States Supreme Court on a materially indistinguishable set of facts. Accordingly, the question presented here is whether the Florida Supreme Court applied the *Strickland* standard in an objectively unreasonable manner.  *See Bell*, 535 U.S. at 699.

### B.2.  Claim II: The Evidence Not Presented

***Intoxication Testimony.***  There is no dispute that Mr. Jennings went to one or more bars and drank into the early morning hours prior to the murder.  While Mr. Howard made a tactical decision not to pursue a voluntary intoxication defense during the guilt phase of trial (F29 at 176), he did present evidence of Mr. Jennings' alleged intoxication during the penalty phase.  Two witnesses and two mental health experts testified during the penalty phase.

Catherine Music, Mr. Jennings' aunt with whom he was residing, testified that Mr. Jennings "fell against the wall" when he entered her house about 5:00 a.m. (F10 at 1610-11, 1613.)  She assumed he had been drinking because he "was unsteady, and staggered, you know, that little bit."  (*Id.* at 1614.)  When Mr. Jennings left the house, ostensibly to buy a pack of cigarettes, she was concerned because she did not think he should be driving in his condition.  (*Id.* at 1614-15.)

Russell Schneider, an acquaintance, testified that he had been drinking with Mr.

Jennings at a bar on the night before the murder.  Mr. Schneider estimated that Mr.

Jennings drank approximately one and one-half pitchers of beer between 11:00

p.m. and 2:30 a.m., when Mr. Schneider left the bar and Mr. Jennings remained.

(*Id.* at 1617-19.)

Additionally, Mr. Howard hired two experts—a psychiatrist, Dr. Michael

Gutman, and a clinical psychologist, Dr. Elizabeth McMahon—who each testified

that when Mr. Jennings was intoxicated, his ability to control his behavior and

conform his conduct to the law were affected.  (F9 at 1364-66, 1376, 1447, 1470,

1475-76, 1481.)

Mr. Jennings contends that Mr. Howard was ineffective by failing to follow up

on the leads discussed below that would have yielded further evidence of

intoxication.  Though Mr. Howard stated that even in light of the additional

evidence, he would not have presented an intoxication defense during the guilt

phase of trial (*id.* at 182, 245), he would have introduced some of the additional

evidence during the penalty phase as evidence of Mr. Jennings' "mental status," his

inability to "conform his conduct . . . to the law," and "possibly on the issue of

intent."  (*Id.* at 183.)  Mr. Jennings also points out that the evidence could have

been presented to the mental health experts as objective evidence of intoxication.

***Annis Music.***  Mr. Howard made a note to contact Annis Music, Mr. Jennings'

cousin and daughter of Catherine Music, who lived in the house where Mr.
Jennings was staying at the time of the murder.  The note indicates that Ms. Music
could testify regarding Mr. Jennings "appearance" on the morning of the murder.
According to her affidavit in 1989, Ms. Music spoke with Mr. Jennings at midnight
and again at 2:30 a.m. on the morning in question.  She testified during the 1997
postconviction evidentiary hearing that Mr. Jennings claimed he was "getting very
drunk" and that he would not be able to drive home from the bar where he was
drinking with Patrick Clawson, Ms. Music's fiancé.  (F29 at 82-83.)  His speech
was slurred.  (*Id.* at 84.)  Ms. Music saw Mr. Jennings around 6:00 a.m. on the
morning of the murder.  She testified that he was "very wide-eyed and, obviously,
very intoxicated" and that he "couldn't walk down the hall without banging into
the walls . . . ."  (*Id.)*  She opined that "by the way he looked" he might have been
doing more than drinking alcohol.  (*Id.* at 86.)

   Mr. Howard recognized that Ms. Music's testimony would be inconsistent with
other testimony regarding intoxication, including that of her mother, Catherine
Music, in that Annis Music's affidavit was "skewed in favor of the defendant"
(*id.*), and "put[] a whole lot more staggering into all of this and drunkenness and
everything."  (*Id.* at 244.)  He also agreed that she would be cross-examined on her
familial relationship to the defendant.  (*Id.* at 209.)

Mr. Jennings claims that Ms. Music's testimony during the penalty phase would have produced a different verdict.  He claims further that, had Mr. Howard contacted Ms. Music, she could have put him in contact with Mr. Clawson, who could have offered similar testimony.  (Pet. at 45-48, 53-54.)

***Patrick Clawson.***  Patrick Clawson had been drinking with Mr. Jennings during the early morning hours before the murder.  Mr. Clawson testified at the 1997 postconviction hearing that when he left the bar at 2:30 a.m., Mr. Jennings was "pretty inebriated" and that Mr. Clawson was "not so sure he could hold himself up . . . he was pretty drunk."  (F29 at 97.)  He also testified that he was skeptical whether Mr. Jennings was sober enough to climb into a window and pull a child out of it.  (*Id.*)  The prosecutor impeached Mr. Clawson with his June 1979 statement in which he said that Mr. Jennings "wasn't falling down drunk, but he might have had a slight stagger, but he was responsible [and] could talk straight." (*Id.* at 100.)  Mr. Clawson admitted that the original statement was accurate.  (*Id.*)

Mr. Howard knew of Mr. Clawson.  In fact he attempted to locate him, but was advised that Mr. Clawson was stationed overseas with the military.  (*Id.* at 196.)  In any event, Mr. Howard indicated a "problem" with calling Mr. Clawson because if he had called Mr. Clawson and obtained favorable testimony, "then this [former contradictory] statement pops up."  (*Id.*)

***Floyd Canada.*** Mr. Jennings also attacks Mr. Howard's failure to call Floyd

Canada (Pet. 52-53, 57), who dropped Mr. Jennings off at his home at 5:00 a.m. on

the morning of the murder, and whose statements included that Mr. Jennings was

staggering drunk. Mr. Howard considered Mr. Canada's favorable statements

"inconsistent" with his initial statement to the police that Mr. Jennings was

"straight" at 4:30 a.m., a statement that "suggest[ed] very strongly that Mr.

Jennings was simply not intoxicated." (*Id.* at 176-77, 198.) Mr. Howard made a

"tactical decision not to put Mr. Canada on the stand," believing his testimony

would be "detrimental" to Mr. Jennings' case. (*Id.* at 199.) Mr. Howard testified

during the 1997 postconviction hearing that he "probably should have taken a

chance with Canada and let the State try to chew him up . . . ." (*Id.* at 265.)

***Catherine Music.*** As noted above, Catherine Music testified during the penalty

phase that Mr. Jennings was drunk around 5:00 a.m. on the morning of the murder.

However, Mr. Jennings claims that Mr. Howard was ineffective by failing to

adduce testimony at trial tracking her earlier statement that Mr. Jennings "looked

kind of wild looking" when he got home. (Pet. at 51; F29 at 193-94.)[11]  Mr.

---

[11]  Mr. Jennings also claims that Mr. Howard failed to elicit Catherine
Music's testimony that Mr. Jennings "fell against the wall and stated, 'Oh, I'm so
drunk,' and that she 'had never seen him looking the way he was looking that
morning.'" (Pet. at 56.)  In fact Ms. Music did testify at trial that "he staggered
and fell against the wall . . . and he said something like, oh, I am so drunk."  (F10
at 1613.)

Howard testified at the postconviction hearing that he had some concern because Catherine Music's statement read as if no one else was present when Mr. Jennings returned home at 5:00 a.m., thus potentially conflicting with Annis Music's claim to have seen him enter the house, particularly given the disparities between their two statements regarding the level of Mr. Jennings' intoxication.     ***Drug Expert.*** Mr. Howard's file also included a notation that he wished to "ask for L.S.D. expert." (*Id.* at 188.)  This issue arose in connection with Mr. Jennings' self-report to the penalty phase mental health experts that he had taken LSD in the hours preceding the murder.  Mr. Howard never contacted an expert to explain the effects of LSD, and he failed to elicit testimony from Drs. Gutman and McMahon regarding the potential effects of LSD.[12]

Mr. Jennings contends that Mr. Howard's neglect of the LSD issue amounted to ineffective assistance with respect to the outcome of the penalty phase.  (Pet. at 48-49, 55.)  During the  postconviction hearing, Mr. Howard presented the testimony of a clinical neuro-psychologist who testified that Mr. Jennings' behavior the morning of the murder was consistent with consumption of LSD, and that LSD would explain his ability to function physically despite his copious consumption of

---

[12] Mr. Howard testified during the postconviction hearing that Dr. McMahon was not qualified to address the effects of LSD.  He did not recall why he had not addressed the matter during Dr. Gutman's testimony.  (F29 at 215-16.)

alcohol.  (F29 at 38-42, 52-53.)

The issue was raised during the penalty phase of trial during the cross-examination of the state's expert psychiatric witness, Dr. Burton Podnos, who testified that Mr. Jennings reported in his psychiatric examination that he had "three or four pitchers of beer and two hits of acid, and that he shared the beer with some friends."  (F10 at 1519.)  Dr. Podnos opined that Mr. Jennings ingestion of LSD would "not necessarily" be a significant factor in the commission of the offenses, (*id.* at 1521-22), but that two average hits of LSD, in conjunction with Mr. Jennings' underlying personality disorder and his consumption of alcohol, "might" impair his ability to conform his conduct to the law (*id.* at 1525), and would likely diminish Mr. Jennings' ability to control his impulses.  (*Id.* at 1528.) Dr. Podnos admitted that, depending upon the actual effect of the alcohol and drugs on Mr. Jennings, his ability to conform his conduct to the law might have been impaired, and his behavior "could easily be classified as an extreme mental disturbance, active psychosis or hallucinations."  (*Id.* at 1534.)  Dr. Podnos concluded on re-direct that the best barometer of Mr. Jennings' state of mind was his ability to carry out the acts of which he had been convicted.  (*Id.* at 1538.)[13]

---

[13] Mr. Howard explained during the postconviction hearing that "all of the witnesses had been asked at various times if they had seen Bryan take any drugs, and that was a rather common theme throughout the investigation . . . and nobody had."  (F29 at 217.)

*Other Evidence.*  Two other matters were raised in Mr. Jennings' second postconviction motion:  Mr. Howard's failure to capitalize upon deposition testimony by Mr. Crisco and his failure to make use of a motion filed by Mr. Kruger in his 1979 criminal proceedings.[14]  These matters were not raised in Mr. Jennings' original October 1989 postconviction motion, and thus were deemed procedurally barred when raised for the first time in the 2001 proceedings before the Florida Supreme Court.  *See Jennings V*, 782 So. 2d at 861.

### B.3   Claim II: Analysis of the State Court Adjudication

*Intoxication Testimony*.  The trial court denied relief on this claim as raised in Mr. Jennings' original postconviction motion dated October 3, 1989.  (F22, Order Summarily Denying Def. Mtn. for Post-Conviction Relief.)  The motion raised

---

[14] Mr. Crisco testified at his deposition that Rebecca Kunash became unconscious immediately and remained unconscious throughout the episode and that Mr. Jennings told Mr. Crisco that he "could not help it" when he murdered her. (*See* Crisco Dep. F28 at 508, 510.)  Mr. Jennings claims the testimony regarding unconsciousness was relevant to the heinous, atrocious and cruel aggravator, and that the statement that Mr. Jennings "couldn't help himself" would have bolstered the mental health experts' testimony in mitigation.  (Pet. at 55-56.)

Mr. Jennings claims that Mr. Howard was ineffective for not finding and using a "Motion for Mental Examination" that Mr. Kruger filed in his own criminal case in April 1979.  (Pet. at 51-52, 57.)  The motion stated that Mr. Kruger was exhibiting "delusional thought patterns" and intended to assert an insanity defense at trial.  (F29 at 167-68.)

counsel's failure to contact Annis Music, Patrick Clawson, and Floyd Canada (F21, Mtn. to Vacate Judgment & Sentence at 30-31; F23, Initial Brief of Appellant at 37-38), and, at least to some extent, the LSD issue.  (F23, Initial Brief of Appellant at 44; F22, Order [on Mtn. for Reh'g] at 6.)   It does not appear that Mr. Jennings raised the issue of Catherine Music's testimony in his original petition.

The trial court addressed the evidence point-by-point, discussing the evidence that was in fact presented with respect to intoxication and highlighting discrepancies that undermined the weight of the evidence not presented.  (F22, Order Summarily Denying Def. Mtn. for Post-Conviction Relief at 3) (noting discrepancies between Catherine Music' and Annis Music's versions of events; noting that Mr. Clawson testified that he, not Mr. Jennings, talked with Annis Music at 2:30 a.m. on the morning of the murder).  The court observed that Mr. Howard "was thoroughly prepared for this trial, as evidenced by pre-trial motions and preparations, thorough objections and well-prepared requests at trial . . . ." (*Id.* at 4.)  The trial court concluded that counsel had not been ineffective.  The trial court's subsequent order upon Mr. Jennings' motion for rehearing went into detail, concluding that Annis Music's testimony was subject to severe impeachment (Order [on Mtn. for Reh'g] at 5-6); that counsel could not have predicted that Mr. Clawson would testify to other than his statement that Mr. Jennings was not

severely impaired (*id.* at 6); that the expert witnesses were well aware of, and

testified with respect to, Mr. Jennings' claims of excessive alcohol consumption, as

well as his alleged LSD consumption (*id.* at 6-8, 8 n.17); and that sufficient

evidence was presented during the penalty phase to establish a potential for

mitigation.  (*Id.* at 9-10.)

    The Florida Supreme Court agreed.  It identified the proper standard, quoted

from the trial court's order, and expressly agreed with it on all points.  *Jennings IV*,

583 So. 2d at 319-21.  Upon review in 2001, the Florida Supreme Court deemed

Mr. Jennings' ineffective assistance claim procedurally barred, as it previously had

been addressed on its merits.  *See Jennings V*, 782 So. 2d at 860, 860 n.8.

    Mr. Jennings has failed to demonstrate that the state adjudication of his claim

was objectively unreasonable.  Specifically, there is nothing to suggest a different

outcome had Mr. Howard offered this additional evidence of Mr. Jennings' alleged

intoxication along with what was presented to the jury.  As the trial court pointed

out, Annis Music's testimony conflicted with her mother's as to the extent of Mr.

Jennings' intoxication.  Mr. Clawson would be subject to impeachment and Mr.

Howard had no way to know whether Mr. Clawson's testimony would be favorable

to Mr. Jennings.  Thus, although Mr. Howard may have been derelict in failing to

track down Mr. Clawson, no prejudice resulted from that oversight.  Mr. Howard

testified that he made a tactical decision not to call Mr. Canada given his

inconsistent statements.  Catherine Music did testify as to Mr. Jennings'

intoxication.  Her earlier statement that Mr. Jennings was "wild" looking is but an

afterthought to this testimony.  The only evidence of Mr. Jennings' LSD

consumption was his self-report to the penalty phase mental health experts.  Mr.

Howard tried to establish through independent investigation whether Mr. Jennings

had taken any drugs other than alcohol, but was unable to do so.  Despite these

obstacles, he managed to elicit an admission from the state's expert witness that,

had Mr. Jennings in fact taken LSD on the night preceding the murder, his ability

to conform his conduct to the law might have been substantially impaired.  Based

on the above and on the overwhelming evidence of guilt, it is not reasonably

probable that the guilty verdict or recommendation of death would have been

different had Mr. Howard presented any one or all of these matters.

Under these circumstances, the Florida Supreme Court's holding that Mr.

Jennings failed to establish a violation of *Strickland* is not objectively

unreasonable.  *See (Terry) Williams*, 529 U.S. at 411 ("[A] federal habeas court

may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly.  Rather, that application must also be

unreasonable."). Accordingly, Mr. Jennings is not entitled to habeas relief insofar as his ineffective assistance claim relates to the intoxication testimony.

   ***Other Evidence.*** Nor is Mr. Jennings entitled to relief with respect to the Crisco statement or the Kruger court filing. The Florida Supreme Court deemed both claims procedurally barred—the Crisco issue because it was successive to his original postconviction penalty phase ineffective assistance claim, and the Kruger issue because it was untimely as well as beyond the scope of the 1991 limited remand, which was limited to the assertion of claims unearthed by review of additional public records erroneously withheld up to that point in time. *See Jennings V*, 782 So. 2d at 861.

   A federal court ordinarily "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). Because this procedural default doctrine is not jurisdictional in habeas cases, *see id.*, 501 U.S. at 730, a procedural default may be excused if the habeas petitioner can demonstrate cause for a procedural default in state court and actual prejudice as a result of the alleged violation of federal law, or where failure to consider the claim would result in a "fundamental miscarriage of justice." *Id.* at

749-50.  Mr. Jennings has made no attempt to overcome the procedural default with respect to the Crisco statement or the Kruger court record and, thus, he is not entitled to relief with respect to these matters.

**B.4.  Claim II: Conclusion**

Mr. Jennings has failed to demonstrate entitlement to relief insofar as his ineffective assistance claim relates to the intoxication testimony.  He has failed to overcome the procedural default with respect to the Crisco statement and Kruger court record.  Claim II is unfounded.

## C.  CLAIM III:  Confrontation

Mr. Jennings alleges that his constitutional right of confrontation was violated when the trial court refused to permit introduction of two prior, ostensibly inconsistent, statements during the cross-examination of Mr. Muszynski.  The claim does not warrant habeas relief.

**C.1.  Claim III: Facts & Procedural Background**

***Trial Proceedings*.**  During trial, Mr. Howard cross-examined Clarence Muszynski with respect to two postconviction motions Mr. Muszynski had filed in 1981 and 1982 in which he claimed to be "totally insane" in 1979 when he committed the offense which put him in jail with Mr. Jennings.  (F5 at 656-58.)

Mr. Howard had Mr. Muszynski identify both documents and sought to introduce

them into evidence to be "included in the court file" but not necessarily "published

to the jury." (*Id.* at 659-60.)  The court advised Mr. Howard to offer them during

his case-in-chief. (*Id.*)

     Mr. Howard established that Mr. Muszynski's motions alleged that less than

one month before his trial, and within months of his encounter with Mr. Jennings,

he had been confined to a mental ward in Texas and had experienced

hallucinations. (*Id.* at 660-61.)  Mr. Muszynski admitted that he had made up the

allegations. (*Id.* at 661-63.)  Mr. Muszynski maintained that he was not placed

under oath and had not read the documents. (*Id.* at 667.)  Mr. Howard attempted

during his case-in-chief to introduce the motions. (F7 at 1122.)  The state objected

on grounds that the motions contained numerous irrelevancies, including the basis

for Mr. Muszynski's prior convictions. (*Id.* at 1124.)  Mr. Howard responded that

it was necessary to impeach Mr. Muszynski's inconsistent statement at trial that he

was never hospitalized. (*Id.* at 1125.)  The court denied admission of the

documents, concluding that Mr. Muszynski had not denied making the prior

statements (which would have permitted the entry of the documents under section

90.614 of the Florida evidence code), but had admitted to making them and had

admitted they were untrue.  (*Id.* at 1126.)[15]

   ***Direct Appeal.***  Mr. Jennings argued on direct appeal that refusal to admit the

statements "violated his constitutional rights."  (F20, Initial Brief of Appellant at

24.)  No substantive argument was directed to the constitutional claims, however.

Following a discussion of generally unhelpful authorities, Mr. Jennings cited

*Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297

(1973), for the correct, but rather broad, proposition that "a trial court may not

frustrate a defendant's legitimate right to present his defense by strict adherence to

state evidentiary rules."  (F20, Initial Brief of Appellant at 27.)  *Cf. Chambers*, 410

U.S. at 302-03 (holding unconstitutional a state hearsay rule that would bar

testimony of witnesses subject to cross-examination that a person other than

defendant confessed to committing the crime, where the confessions were against

interest and corroborated by other evidence in the case).  Mr. Jennings concluded

that "[t]he Sixth Amendment right to present evidence is supreme, and any doubts

must be resolved in favor of that fundamental right."

   The Florida Supreme Court concluded that "[t]he motions could not be

introduced for purposes of impeachment because Muszynski admitted that he had

---

   [15] Though it was not directly at issue during the colloquy, it should be
reiterated that, to the extent the documents might prove that Mr. Muszynski signed
them under oath, the jurats were read to the jury, and Mr. Muszynski admitted
signing the documents.

made the prior inconsistent statements." *Jennings III*, 512 So. 2d at 173 (citing §90.614, Fla. Stat.).  The court also noted that "[i]n any event, [Mr. Jennings] received whatever benefits the motions could give him because their contents were made clear to the jury and defense counsel read aloud the oath in its entirety." *Id.*

### C.2.  Claim III: Analysis

Mr. Jennings claims that Mr. Howard sought to introduce the motions to attack Mr. Muszysnki's claim that he did not know he was under oath when he signed the motions.  (Pet. at 61.)  This is not borne out by the trial record, as outlined above.  Be that as it may, Mr. Jennings claims that the Florida Supreme Court erred by failing to conduct a "Sixth Amendment analysis" of his claim on appeal.  (*Id.*)[16] Mr. Jennings does not, however, suggest what Sixth Amendment authorities the Florida Supreme Court might have applied, and he has cited no federal authority that might support the result he urges in this case.

In this proceeding, Mr. Jennings cites only two federal cases throughout his argument.  First he cites to a portion of  *Pointer v. Texas*, 380 U.S. 403, 404, 85 S.

---

[16] The state urges that this claim is procedurally barred because the Florida Supreme Court decided the issue on state grounds.  (Resp. at 44.)  Mr. Jennings' appeal brief did at least nominally frame a constitutional argument.  Mr. Jennings could overcome a procedural bar were his claim meritorious—the refusal of a state court to consider a federal constitutional argument would constitute cause, and denial of a claim on the merits would constitute prejudice and/or a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 749-50 (setting out the cause and prejudice standard).

Ct. 1065, 13 L. Ed. 2d 923 (1965), which says nothing of value to Mr. Jennings'

claim, holding that the state could not introduce into evidence the statement of an

accomplice who was not available to testify at trial and who was not subject to

cross-examination by an attorney in any prior proceeding. *See id*. at 406-07.  The

other federal case cited by Mr. Jennings is *United States v. Cronic*, 466 U.S. 648,

104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), from which he merely borrows the

phrase "crucible of meaningful adversarial testing."  (Pet. at 63) (quoting *Cronic*,

466 U.S. at 648).  The Court in *Cronic* addressed an ineffective assistance claim

that did not resemble the current facts.

    In short, Mr. Jennings seeks to capitalize on the Florida Supreme Court's failure

(or choice, as the case may be) not to address the merits of the constitutional claim

he asserted on direct appeal.  But he cites no federal authority to support his claim

that extrinsic evidence of a prior inconsistent statement must be admitted despite a

witness's acknowledgment that he made the prior statement.  No clearly

established federal authority exists to support such a claim.  *Cf. United States v.*

*Young*, 248 F.3d 260, 268 (4th Cir. 2001) (holding, under the more liberal federal

evidentiary Rule 613, that a court has Rule 403 discretion to narrow the scope of,

or to exclude altogether, extrinsic evidence of a prior inconsistent statement); Fed.

R. Ev. 608(b) (excluding extrinsic evidence of prior conduct of witness—other

than conviction of crime—for purpose of supporting or attacking witness's credibility).

### C.3.  <u>Claim III: Conclusion</u>

Mr. Jennings cites no support for his claim of constitutional entitlement to the admission of Mr. Muszynski's motions.  He has not established that the Florida Supreme Court reached a result in any way at odds with clearly established federal law.  Nor has he claimed or proved that the state decision was premised upon an unreasonable fact determination.  Claim III is unfounded.

## D.  <u>CLAIM IV</u>:  *Edwards*

Mr. Jennings next claims that the state was permitted to introduce evidence obtained as the fruit of an interrogation that violated *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (holding that once an accused requests counsel, he may not be interrogated further until counsel has been made available or the accused initiates further communications).  What error Mr. Jennings seeks to assign the state courts through this claim is unclear.  (Pet. at 64-66.)  The claim does not warrant habeas relief.

### D.1.  <u>Claim IV: Facts & Procedural Background</u>

*Investigation.*  Shortly after the murder, Mr. Jennings was identified as a

suspect and taken into custody on an outstanding traffic warrant.  He was fingerprinted, and his fingerprints matched those found at the murder scene.  He was then interrogated about the murder.  He confessed, and evidence was obtained pursuant to the confession, including a sweatshirt Mr. Jennings had discarded from a bridge and certain diagrams he drew.  (F18 at 3240-41.)  The police also obtained hair samples and photographs of his person.  (*Id.*)  The United States Supreme Court vacated Mr. Jennings' second conviction based upon admission of the confession, which was obtained in violation of *Edwards*.  *See Jennings v. Florida*, 470 U.S. 1002, 105 S. Ct. 1351, 84 L. Ed. 2d 374 (1985) (mem.).

   ***Third Trial.***  Before his third trial, Mr. Jennings sought to suppress all of the evidence described above, reasoning that all of the evidence was fruit of the poisonous tree.  (F18 at 3238-43.)  The trial court suppressed Mr. Jennings' confession, the sweatshirt, and the diagrams, reasoning that they flowed directly from the improper interrogation.  (F12 at 1991-92.)  But the court admitted the remaining evidence, including fingerprints, hair samples, and photographs of Mr. Jennings' penis, reasoning that this evidence inevitably would have been obtained through discovery.  (*Id.*)

   ***Direct Appeal.***  Mr. Jennings reiterated his argument on direct appeal.  (F20, Initial Brief of Appellant at 21-22.)  The Florida Supreme Court assumed without

deciding that the fruit of the poisonous tree doctrine applies to *Edwards* violations

and found that no violation had occurred because the evidence would inevitably

have been discovered.  *See Jennings III*, 512 So. 2d at 171-72.

### D.2.  <u>Claim IV: Analysis</u>

The basis for Mr. Jennings' challenge is not entirely clear.  His petition initially

asserts violation of the fruit of the poisonous tree doctrine, concluding that "the

Florida Supreme Court's ruling was [an] unreasonable application of federal

constitutional law."  (Pet. at 64-65.)  He then suggests that his ability to assert his

fruit argument was hampered by the state's withholding of the field interrogation

cards discussed in Part III.A.2 above,  (Pet. at 66), apparently reasoning that he

could have used the cards to demonstrate that the police would not necessarily

have pursued him as a suspect.[17]

At no point does Mr. Jennings cite any federal authority that conflicts with the

Florida Supreme Court's determination of this claim.  Nor does he attempt to

---

[17] This line of reasoning is meritless because, at the time of Mr. Jennings'
interrogation,"eighteen or nineteen" other leads existed (F12 at 1913-14) and the
police had already matched his shoe print and fingerprints with those found at the
murder scene.  The head of the homicide division testified unequivocally that
"Bryan Jennings was going to be arrested that night whether interviewed or not."
(*Id.* at 1915.)  Likewise, the lead investigator testified that during the time between
an initial interview of Mr. Jennings and the unlawful interrogation, the investigator
had retrieved items of wet clothing that Mr. Jennings was wearing when he arrived
home on the morning of the murder.  (*Id.* at 1932-33.)

explain in what way that court's adjudication might have unreasonably applied

federal law; indeed, he does not cite any case or other federal law that he believes

was applied unreasonably.  The court's decision was well-reasoned and was not

contrary to, or an unreasonable application of, federal law.  And more recently, the

United States Supreme Court has rejected the very premise of Mr. Jennings'

claim—that physical evidence obtained in violation of *Edwards* is inadmissible.

*See United States v. Patane,* 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667

(2004).  This standing alone would require rejection of this claim.  *See* 28 U.S.C.

§2254(d)(1) (requiring a petitioner to establish a violation of "clearly established

federal law").

### D.3.  Claim IV: Conclusion

The United States Supreme Court has rejected the premise of Mr. Jennings'

fruit of the poisonous tree argument.  The Florida Supreme Court's rejection of the

fruit argument did not conflict with or unreasonably apply federal law.  Claim IV is

unfounded.

## E.  CLAIM V:  Motion to Suppress

Mr. Jennings argues that his Fourth, Fifth, and Fourteenth Amendment rights

were violated because the trial court failed to suppress evidence obtained in

conjunction with his warrantless arrest.  This claim is without merit.

### E.1.  Claim V:  Background

***Suppression Hearing.***  Before trial, Mr. Jennings filed a motion to suppress evidence seized in conjunction with his arrest based upon an outstanding traffic court warrant, which the officers did not have in hand at the time of the arrest. Specifically, he sought to suppress the shoes collected from his home, with the consent of his aunt and mother, and the fingerprint cards made at the time of his arrest.  (F18 at 3238-43; Pet. at 66.)

The court held a suppression hearing on the motion.  (F12 at 1896-1996.)  The hearing included testimony from the officer "who had requested the computer check" which "verif[ied] that a 'hit' had come back prior to the arrest and then introduced a certified copy of the Orange County docket sheet reflecting the outstanding warrant during the appropriate period of time."  (F18 at 3289-90.) Officers who searched the area around the victim's home developing leads on possible suspects also testified.  (F12 at 1905-77.)  The existence of other leads or suspects, and their bearing on how law enforcement approached Mr. Jennings, were also specifically addressed, with testimony revealing that 18 or 19 leads were being followed at the time the sheriff's office ran a computer check against Mr. Jennings and discovered an outstanding warrant.  (F12 at 1913-14, 1919, 1923-24,

1930, 1950-51.)  Mr. Howard argued that the initial interview of Mr. Jennings

prompted the police to interview his mother and obtain the wet clothes and shoes.

(*Id.* at 1984.)  The trial court denied the motion to suppress, stating that although

the arresting officers did not have a copy of the warrant "in hand," they were

properly relying on a "computer check printout" which indicated the existence of

an "outstanding warrant during the appropriate period of time."  (F18 at 3289-90.)

The court also "specifically found" that the police would have found the items in

Mr. Jennings' aunt's home even without the initial interview.  (F18 at 3290.)

    ***Direct Appeal.***  Mr. Jennings challenged the denial of the motion in his direct

appeal and argued that the shoes and fingerprints should have been suppressed.

(F20, Initial Brief of Appellant, at 33-39.)  The Florida Supreme Court "reject[ed]"

the claim "without comment."  *Jennings III*, 512 So. 2d at 176.

    ***Federal Habeas Proceedings.***  Mr. Jennings again claims that the sheriff's

office violated his constitutional rights in arresting him when the arresting officers

had no warrant in hand and when none was ever produced and thus the court

should have suppressed the shoes and fingerprints taken in conjunction with that

arrest.  (Pet. at 66-70.)  Further, he claims that he did not receive a full and fair

hearing in state court because, at the time of the hearing, the state had withheld the

five field notes, and that "knowledge of their [the field note cards'] existence was

essential to litigating the State's probable cause and inevitable discovery justifications for the admission of evidence over Mr. Jennings' objections."  (Pet. at 70; F28 at 538-47.)

**E.2.  Claim V:  Analysis**

The United States Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 481-82, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976).  Stated differently, "[a] Fourth Amendment claim is not cognizable in federal habeas proceedings if a petitioner has had a full and fair opportunity to litigate the claim in state court."  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

Here, Mr. Jennings was given an adequate opportunity to argue his claim during the state's suppression hearing.  He has offered no evidence that the suppression hearing failed to give him "an opportunity for full and fair litigation" of his claim, as required by *Stone* and *Ortiz-Sandoval*, other than the alleged withholding of the field note cards, discussed in Part III.A.2.  Mr. Jennings makes no attempt to explain how the absence of the five field notes hampered his counsel during the

suppression hearing, besides vaguely stating that they were "essential."  He offers

no explanation of how the existence of five field note cards would bear upon the

legality of his initial arrest, the resulting fingerprinting, or the post-interview

seizure of items from his home.

### E.3.  Claim V:  Conclusion

Mr. Jennings had an opportunity to litigate his Fourth Amendment claim in the

state's suppression hearing.  He has not successfully demonstrated that the

prosecution's withholding of five field note cards deprived him of full and fair

litigation of his claim in state court.  Claim V is unfounded.

## F.  CLAIM VI:  *Ring*

Mr. Jennings argues that he was deprived of his Sixth Amendment right to a

trial by jury because the Florida death penalty scheme under which he was

sentenced did not require the jury to determine the existence of facts warranting the

death penalty, which he claims is required under *Ring v. Arizona*, 536 U.S. 584,

122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) .  That decision held unconstitutional

Arizona's capital sentencing scheme under which a judge, sitting alone, determined

the facts that might raise a defendant's maximum penalty to death.

### F.1.   Claim VI:  Background

This habeas proceeding was held in abeyance so that Mr. Jennings could press a claim in state court pursuant to *Ring*.  The Florida Supreme Court ultimately denied relief.  *See Jennings v. Crosby*, 857 So. 2d 196 (Fla. 2003) (table opinion). The United States Supreme Court now has held that *Ring* does not apply retroactively to habeas petitioners.  *See Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519, 2526, 159 L. Ed. 2d 442 (2004) ("*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review.").  The Eleventh Circuit earlier had reached the same conclusion.  *See Turner v. Crosby*, 339 F. 3d 1247, 1285 (11th Cir. 2003) ("because *Ring*'s new rule had not been announced at the time Turner's convictions and sentences became final, *Ring* does not apply retroactively to his §2254 [habeas] petition . . . .").

## F.2.  <u>Claim VI:  Analysis</u>

That *Ring* does not apply retroactively does not mean that the Florida death penalty sentencing scheme ultimately will survive *Ring*.  But under AEDPA, the Florida Supreme Court's adjudication will be disturbed only if it violated federal law as clearly established by the United States Supreme Court.  Until *Ring* was decided, Supreme Court precedent on the point was not clearly established but seemed to suggest a different rule.  *See Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (upholding Arizona sentencing scheme against a

claim that aggravating circumstances are "elements" of an offense that must be decided by a jury) (overruled by *Ring*).[18]

### F3:  <u>Claim VI:  Conclusion</u>

Because *Ring* does not apply retroactively, Mr. Jennings cannot demonstrate that the Florida Supreme Court's adjudication of this claim was contrary to or unreasonably applied any then existing federal law.  Claim VI is unfounded.

### <u>G.  CLAIM VII</u>:  The CCP and HAC Jury Instructions

Mr. Jennings next argues that the Florida Supreme Court violated his rights and erred by failing to rectify ostensible errors in the jury instructions pertaining to the cold, calculated and premeditated ("CCP") aggravator and the heinous, atrocious or cruel ("HAC") aggravator.[19]

### G.1.  <u>Claim VII: Procedural Background</u>

***Trial Proceedings.***  Upon conviction of guilt, a capital defendant in Florida is entitled to an additional proceeding commonly referred to as the "penalty phase." At the close of the penalty phase the jury is instructed to consider any evidence

---

[18] Even now, the United States Supreme Court has not held unconstitutional the imposition of the death penalty when a jury finds the facts necessary to its imposition, as occurred in the case at bar.

[19] This attack on the CCP jury instruction is separate from Mr. Jennings' ex post facto attack on any use of the CCP aggravator at all, which is Claim IX.

presented and to render an advisory sentence.  It must first determine whether

sufficient aggravating circumstances exist to warrant imposition of the death

penalty.  If it finds sufficient aggravating circumstances, it must then determine

whether any mitigating circumstances outweigh the aggravating circumstances.

Aggravators may be considered only if proven beyond a reasonable doubt;

mitigators may be considered if proven by a preponderance of the evidence.  The

jury need not reveal what aggravators or mitigators it considered, and its

recommendation need not be unanimous.  *See* §775.082, Fla. Stat. (prescribing a

life sentence for first-degree murder unless the death penalty is imposed following

set procedures); §921.141, Fla. Stat. (providing the procedures by which a death

sentence may be imposed).

The jury in Mr. Jennings' case was instructed that it might consider any of the

following aggravators established by the evidence:

1.  That the crime for which Bryan Frederick Jennings is to be sentenced was committed while the defendant was engaged in the commission of or an attempt to commit the crime of sexual battery, burglary or kidnapping.

2.  That the crime for which the defendant is to be sentenced was especially wicked, evil, atrocious or cruel.

3.  The crime for which the defendant is to be sentenced was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.

(F10 at 1699.)[20]

*Direct Appeal.*  On direct appeal of his conviction, Mr. Jennings took issue with the court submitting the HAC aggravator to the jury without the terms "wicked, atrocious, or cruel" being narrowly defined in accordance with prior state court interpretations.  (F20, Initial Brief of Appellant at 67-70.)  The CCP aggravator was not mentioned in this regard.  The Florida Supreme Court rejected the argument "without comment."  *Jennings III*, 512 So. 2d at 176.  The court did, however, address Mr. Jennings' separate claim that the judge erred by relying upon the HAC and CCP aggravators in imposing sentence by upholding the judge's application of the aggravators.  *See id.* at 175-76.

*Postconviction Proceedings.*  Mr. Jennings resurrected the issue during his 1997 postconviction proceedings, arguing that both the HAC and CCP aggravators were unconstitutionally vague due to the trial court's failure to include limiting definitions in the jury instructions.  (F28 at 389-406.)  The trial court rejected the CCP claim as procedurally barred and deemed it meritless in an alternative holding.  The HAC claim was denied solely on the merits.  (F30, Order at 14-16.)  Mr. Jennings raised the issue on appeal.

---

[20] Note that Mr. Jennings' jury was charged using the formulation "especially wicked, evil, atrocious or cruel."  It is this formulation that is at issue, but in keeping with standard usage in the relevant cases, it will be referred to by the designation HAC, which stands for "heinous, atrocious, or cruel."

The Florida Supreme Court agreed that the CCP issue was procedurally barred and, like the trial court, offered an alternative holding denying the claim on its merits. Specifically, the court held that "the trial court properly denied relief . . . . First, the State's argument (based on the trial court's ruling) that appellant failed to preserve the error as to the CCP instruction is supported by the record." *Jennings V*, 782 So. 2d at 862. The court explained that the claim was procedurally barred because Mr. Jennings failed to raise it on direct review and then analyzed and approved the trial court's alternative merits holding based on a harmless-error analysis of the CCP aggravator. *See id.*

With respect to the HAC claim, the Florida Supreme Court recognized that under *Espinosa v. Florida*, 505 U.S. 1079, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992), neither the advisory jury nor the trial judge may weigh an invalid aggravator, *see id.* at 1082, and that the *Espinosa* Court deemed Florida's HAC aggravator unconstitutionally vague. *See id.* at 1081. The court concluded that, under the facts of Mr. Jennings' case, the HAC aggravator would have been found even if the jury had been properly instructed or, alternatively, even if the HAC aggravator had been struck altogether, thus rendering harmless any error in the instruction. *See Jennings V*, 782 So. 2d at 862-63.

### G.2.  <u>Claim VII: Analysis</u>

*CCP Aggravator.*  The Florida Supreme Court disposed of this issue on state procedural grounds.  Accordingly, Mr. Jennings' federal habeas claim is procedurally barred unless he demonstrates cause and prejudice to overcome the default.  *See Coleman*, 501 U.S. at 749-50.  That is true even where, as here, the state court announces an alternative substantive holding.  *See Harris*, 489 U.S. 255 at 264 n.10.  Were it otherwise, the Florida Supreme Court's harmless-error analysis would preclude the relief Mr. Jennings seeks, as discussed below.  Mr. Jennings has made no attempt to overcome the procedural default, and therefore he is not entitled to relief on the CCP aggravator.

*HAC Aggravator.*  There is no question that the instruction as given was unconstitutionally vague.  *See Espinosa*, 505 U.S. at 1081 (deeming same aggravator unconstitutionally vague).  When an unconstitutionally vague aggravator is submitted to a jury, however, a new jury determination is not necessarily required; there are two other options.  *See Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1989).  In *Clemons*, the defendant was sentenced to death in Mississippi, a so-called "weighing" state (like Florida), in which "the jury is required to weigh any mitigating factors against the aggravating circumstances."  *Id.* at 745.  Mr. Clemons argued that the jury instructions erroneously allowed the jury to consider an unconstitutionally vague

HAC aggravating factor and that the Mississippi Supreme Court therefore should have remanded the case for a jury determination rather than reweighing the evidence itself.  *Id.* at 741, 743.  The United States Supreme Court held that neither the Eighth nor the Fourteenth Amendment requires a remand for jury reweighing of the aggravating and mitigating circumstances so long as the appellate court reweighs the evidence without the improper aggravator.  *See id.* at 747-50. *Clemons* held further that a state appellate court may conduct a harmless-error analysis after striking an invalid aggravator that was erroneously submitted to the jury.  *Id.* at 752-53 (citing *Barclay*, 463 U.S. 939, 958, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983) (plurality op.)).[21]

Under *Clemons*, a state appellate court that invalidates an aggravator submitted to a jury does not have to remand for jury reweighing of the evidence if it reweighs the evidence itself or conducts a harmless-error analysis.  In Mr. Jennings' case, the Florida Supreme Court did both.

---

[21] The Mississippi statute at issue in *Clemons*, unlike Florida's sentencing scheme, gave a capital jury *exclusive* power to impose the death sentence.  *See* Miss. Code Ann. 99-19-101 (Supp. 1989).  In other words, a Mississippi jury, unlike a Florida jury, does not render an advisory verdict.  Its verdict is final.  If reweighing or harmless-error analysis is permissible in those circumstances, then clearly it is permissible where the same error occurs with an advisory jury, as in Florida.  The Supreme Court has recognized as much in a decision handed down after Mr. Jennings' conviction became final.  *See Sochor v. Fla.*, 504 U.S. 527, 112 S. Ct. 2114, 119 L. Ed. 2d 326 (1992).

The court quoted Mr. Muszynski's testimony at length and concluded, based upon a comparison with other state cases, that the HAC aggravator would have been found by the jury if properly instructed. *See Jennings V*, 782 So. 2d at 863. Given the facts of this case, that conclusion was unassailable and was fully consistent with prevailing federal authorities.

The court also concluded, alternatively, that even without the HAC aggravator, the jury would have recommended death based on the remaining aggravators, the absence of mitigation, and the brutal nature of the crime. *See id.* n.9. This conclusion was, again, unassailable and fully consistent with prevailing federal authorities.

To be sure, as will be discussed below, the CCP aggravator should not have been relied upon at all. The Florida Supreme Court never explicitly said it would reach the same result based on a reweighing taking into account only the HAC and sexual battery or kidnaping aggravators. Nor did the court explicitly state that consideration of the CCP aggravator constituted harmless error because the HAC and sexual battery or kidnaping aggravators, standing alone, would have resulted in a death sentence. But the court's entire discussion of the HAC and CCP aggravators and the attendant reweighing and harmless analysis made clear that the court did indeed believe that the CCP aggravator was unnecessary to the result.

Thus the court said that "the trial court properly determined that both errors (CCP

in the alternative) constitute harmless error." *Jennings V*, 782 So. 2d at 862.  And

the court said that even without one of the three aggravators found by the jury, "in

light of the two remaining aggravating factors, the complete absence of mitigation,

and the brutal nature of the crime in which a six-year-old girl was abducted from

her own home, raped and killed," there was "no reasonable possibility that [Mr.

Jennings] would have received a life sentence." *Id.* at 863 n.9.[22]  Sending this case

back to the Florida Supreme Court so that it could say again what it has already

said, again reweigh the evidence, and again apply the harmless error doctrine

would make no sense.[23]

### G.3.  Claim VII:  Conclusion

Mr. Jennings's claim regarding the jury instructions fails.  As to the CCP

------

[22] The court made these statements when addressing the possible invalidation of the HAC aggravator.  But the same analysis is equally true, and clearly would have been followed by the Florida Supreme Court, with respect to invalidation of the CCP aggravator.  With either the HAC or CCP aggravator (or even both) eliminated, the crime would remain as brutal, the sexual battery or kidnaping aggravator would remain fully applicable, and there still would be a complete absence of mitigation.

[23] No controlling case holds that a federal habeas court cannot itself apply harmless error analysis on issues such as this.  To the extent I properly can do so, I conclude that the giving of the CCP instruction was harmless beyond a reasonable doubt.  The jury, trial judge, and Florida Supreme Court all would have reached the same decision even had the CCP instruction not been given at all, as it should not have been.

aggravator, he is procedurally barred from claiming that it was erroneously presented to the penalty-phase jury.  As to the HAC aggravator, Mr. Jennings is correct that the jury instruction was unconstitutionally vague, but he has failed to demonstrate that the Florida Supreme Court's reweighing and harmless-error analyses were contrary to or unreasonably applied any clearly established federal law.  He does not claim that any unreasonable fact determinations were made.  Accordingly, he has failed to demonstrate entitlement to federal habeas relief.  Claim VII is unfounded.

## H.  CLAIM VIII:  *Sochor*

In this claim, which is intimately related to Claim VII, Mr. Jennings argues that the harmless-error analysis of the aggravators conducted by the Florida Supreme Court was insufficient in light of *Sochor v. Florida*, 504 U.S. 527, 112 S. Ct. 2114, 119 L. Ed. 2d 326 (1992).[24]

### H.1.  Claim VIII:  Analysis

In *Sochor*, a Florida jury found the defendant guilty of capital murder and then considered four aggravating factors, including Florida's HAC and CCP

---

[24] *Sochor* was decided after Mr. Jennings' conviction became final, but the state does not suggest that *Sochor* enunciated a "new" rule that does not apply retroactively to habeas petitioners.  Rather, the relevant portion of *Sochor* is merely an application of *Clemons*, which is addressed in Part III.G.

aggravators.  *Id.* at 530.  The jury recommended death and the trial court imposed

the death penalty, having applied the four aggravating circumstances and finding

no mitigation.  *See id.*  The United States Supreme Court held that the evidence did

not support the CCP factor, but it affirmed Sochor's conviction, based upon what

the petitioner called an unsatisfactory *Clemons* harmless-error analysis.  *Id.* at 531

(quoting *Sochor v. State*, 580 So. 2d 595, 604 (Fla. 1992)).  The Supreme Court

characterized the issue before it as "the adequacy of the State Supreme Court's

effort to cure the error under the rule announced in *Clemons*, that a sentence so

tainted requires appellate reweighing or review for harmlessness."  *Id.* at 539.

This claim is nothing more than a reiteration of the preceding claim.  Just as Mr.

Jennings failed to demonstrate an error in the Florida Supreme Court's *Clemons*

analysis in the preceding claim, he has failed to do so here.

**H.2.  Claim VIII:  Conclusion**

Mr. Jennings has failed to demonstrate that the Florida Supreme Court's

reweighing or harmless-error analysis was contrary to or unreasonably applied any

clearly established federal law.  Claim VIII is unfounded.

## I.  CLAIM IX: Ex Post Facto CCP Aggravator

Mr. Jennings argues that submission of the CCP aggravator to the jury and

reliance upon that aggravator by the judge in imposing sentence violated the
federal constitutional prohibition against ex post facto laws because he murdered
Rebecca Kunash on May 11, 1979 and the CCP aggravator was not added to
Florida's statutory sentencing scheme until July 1, 1979. *See* U.S. Const. art. I, §
10; Ch. 79-353, Laws of Fla.

## I.1. <u>Claim IX: Procedural Background</u>

***Direct Appeal.*** Mr. Jennings first raised this issue in the direct appeal of his
conviction. (F20, Initial Brief of Appellant at 85.) The Florida Supreme Court did
not squarely confront the issue (which was a cursory argument buried in Mr.
Jennings' appellate brief). The court did, however, pass upon the merits of the
claim in which the argument was made, concluding that the CCP aggravator was
supported by the record. *Jennings III*, 512 So. 2d at 175-76.

***Postconviction Proceedings.*** Mr. Jennings raised the claim again in his 1990
postconviction proceedings (F23, Initial Brief of Appellant at 88-90), where the
Florida Supreme Court denied the claim on the merits by reference to earlier state
case law. *See Jennings IV*, 583 So. 2d at 321.

***Federal Habeas Proceeding.*** The state argues that Mr. Jennings' claim as now
presented in this court is procedurally barred because his argument is different
from that presented to the state courts. (Resp. at 55-56.) This is not so. The thrust

of the argument and the federal authorities relied upon are identical in Mr.

Jennings' state court papers and the instant federal habeas petition.  The matter has

been preserved and appropriately presented for a merits review.

**I.2.   Claim IX: Analysis of the State Decision**

The ex post facto clause prohibits the operation of "'any statute which punishes

as a crime an act previously committed, which was innocent when done; *which*

*makes more burdensome the punishment for a crime, after its commission*, or

which deprives one charged with [a] crime of any defense available according to

law at the time when the act was committed . . . .'"   *Dobbert v. Fla.*, 432 U.S. 282,

292, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977) (citation omitted) (emphasis added).

It ensures statutes "give fair warning of their effect,"  *Weaver v. Graham*, 450 U.S.

24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981), and "forbids the imposition of

punishment more severe than the punishment assigned by law when the act to be

punished occurred . . ." *Id.* at 30.

According to United States Supreme Court precedent that was clearly

established at the time Mr. Jennings appealed the denial of his postconviction

motion, "two critical elements must be present for a criminal or penal law to be ex

post facto: [1] it must be retrospective, that is, it must apply to events occurring

before its enactment, and [2] it must disadvantage the offender affected by it. . . .

[E]ven if a statute merely alters penal provisions accorded by the grace of the

legislature, it violates the clause if it is both retrospective and more onerous than

the law in effect on the date of the offense." *Id.* at 30-31. The ex post facto clause

is not violated, however, by a mere procedural change that "does 'not increase the

punishment nor change the ingredients of the offense or the ultimate facts

necessary to establish guilt.'" *Id.* n.12 (quoting *Hopt v. Utah*, 110 U.S. 574, 4 S.

Ct. 202, 28 L. Ed. 262 (1884)).

In Mr. Jennings' case, there is no dispute that the statutory amendment adding

the CCP aggravator was applied retroactively.  Therefore, the focus of the inquiry

is whether the amendment worked to Mr. Jennings' detriment, that is, that it was

more onerous than the law in effect when he committed the crime.  If the change

was merely procedural, however, no violation will be found.

***Statutory Background.***  As of May 11, 1979, premeditated murder constituted a

first-degree murder and was a capital felony under Florida law.  *See* §782.04(1)(a),

Fla. Stat. (1977).[25]  The crime was punishable "as provided in s. 775.082," *id.*,

which provided that one convicted of a capital felony:

---

[25] The 1977 version of the relevant portion of each of the three statutes
discussed here was in effect as of May 11, 1979.  Two of the statutes had been
amended prior to the murder.  One amendment was irrelevant to the issues at hand.
*See* Ch. 79-400 (amending §782.04).  The other was the addition of the CCP
aggravator to §921.141, which is the amendment under discussion.  *See* Ch. 79-353
Laws of Fla.

*shall be punished by life imprisonment* and shall be required to serve no less than 25 years before becoming eligible for parole *unless the proceeding held to determine sentence according to the procedure set forth in s. 921.141 results in findings by the court that such person shall be punished by death*, and in the latter event such person shall be punished by death.

§775.082(1), Fla. Stat. (1977) (emphasis added).  At the time, §921.141 did not include the CCP aggravator, thus giving rise to the issue at hand.

Section 921.141(1) stated that upon adjudication of guilt for a capital felony, the court must conduct a separate sentencing "to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082." After receiving the jury's advisory verdict, the court was required to determine the sentence.  If the court imposed a death sentence, it was required to set forth in writing its findings, including that "sufficient aggravating circumstances exist as enumerated in subsection (5) . . . ."  §921.141(3)(a), Fla. Stat. (1977).  Failure to set forth the court's findings precluded the imposition of a death sentence.  *See* §921.141(3), Fla. Stat. (1977).  Subsection 5 of the statute set forth eight aggravating circumstances that would support a death penalty.  Effective July 5, 1979—two months after Mr. Jennings murdered Rebecca Kunash—the CCP aggravator was added to this list.

**The State Court Decisions.**  The Florida Supreme Court addressed Mr.

Jennings' ex post facto claim with this holding:

> Jennings also claims that the cold, calculated, and premeditated factor
> was unconstitutionally applied retroactively during sentencing. We have
> previously rejected this claim on its merits. *Zeigler v. State*, 580 So.2d 127
> (Fla.1991); *Combs v. State*, 403 So.2d 418 (Fla.1981), *cert. denied*, 456 U.S.
> 984, 102 S.Ct. 2258, 72 L.Ed 2d 862 (1982).

*Jennings IV*, 583 So. 2d at 321.  In essence, the court adopted its earlier discussions

in *Zeigler* and *Combs*, where the same issue was raised.  In *Zeigler*, the court

merely summarized and reiterated the holding in *Combs*:

> [T]he judge did not apply this [CCP] aggravating factor because he believed
> that it would violate the prohibition against ex post facto laws because
> Zeigler committed this crime and was originally sentenced before this
> aggravating factor was enacted. In *Combs v. State*, 403 So.2d 418 (Fla.
> 1981), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed 2d 862 (1982),
> this Court held that the prohibition against ex post facto laws is not violated
> by applying the cold, calculated, and premeditated aggravating factor to a
> murder committed before the legislature enacted that aggravating factor. We
> determined that the factor could be constitutionally applied to a crime
> committed before the factor was enacted because the statute only reiterated
> an element already present in the crime of premeditated murder. *Id.* at 421.
> Premeditation was not an entirely new factor. Therefore, the use of the factor
> in this case does not violate the ex post facto laws.

*Zeigler*, 580 So. 2d at 130.  This is a fair summary of *Combs*, which held that

"[p]aragraph (i) [the CCP aggravator] in effect adds nothing new to the elements of

the crimes for which petitioner stands convicted but rather adds limitations to those

elements for use in aggravation, limitations which inure to the benefit of a defendant." *Combs*, 403 So. 2d at 421 (citations omitted).  This represents an objectively unreasonable failure to apply federal ex post facto principles to the sentencing statute.

Despite the Florida Supreme Court's efforts to characterize the CCP aggravator as a mere extension of the premeditated element of first-degree murder, the fact remains that before it was added to the statute, premeditation alone was not listed as an aggravator and could not serve as such.  Section 775.082 set the maximum punishment for premeditated murder at life imprisonment *unless* a proceeding was held under §921.141  "to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082." §921.141(1) (emphasis added).  A death sentence could be imposed *only if* sufficient statutorily enumerated aggravators were identified and the court explained why mitigators did not outweigh those aggravators.  Given that premeditation was not a statutory aggravator, it alone could not have served as the basis for a death sentence.

Further, to propose that the CCP aggravator inured to the defendant's benefit plainly is mistaken, for the defendant was not subject *in any way* to imposition of a death sentence based solely upon premeditation prior to addition of the CCP aggravator.  The Florida Supreme Court's own subsequent cases bear out this

point.  In *Combs*, the court said "[p]aragraph (i) [the CCP aggravator] in effect

adds nothing new to the elements of the crimes for which petitioner stands

convicted . . . ."  403 So. 2d at 421.  But when faced with claims that the

aggravator failed to narrow the class of persons eligible for the death penalty, the

court stated otherwise:  "the level of premeditation needed to convict in . . . a first

degree murder trial does not necessarily rise to the level of premeditation in

subsection (5)(i)."  *Jent v. State*, 408 So. 2d 1024, 1032 (Fla. 1981).  Similar is this

statement from *Brown v. State*, 473 So. 2d 1260 (Fla. 1985):  "[T]he [CCP] factor

places a limitation on the use of premeditation as an aggravating circumstance in

the absence of some quality setting the crime apart from mere ordinarily

premeditated murder."  *Id.* at 1268.  *See also Card v. State*, 453 So. 2d 17, 23 (Fla.

1984) ("premeditation must rise to a level beyond that which is required for a first

degree murder conviction").  These pronouncements are irreconcilable with the

statement in *Combs* that the CCP aggravator "adds nothing new to the elements of

[premeditated murder]."

Justice Marshall's dissent from a denial of certiorari on this issue accurately

summarized the fatal defects in the Florida Supreme Court's approach:

> The State's sole argument is that the application of this new aggravating
> factor had no detrimental effect on petitioner, and therefore was not onerous
> under *Weaver*.  The State's view is that, since premeditation was already an

element of first-degree murder, the retroactive application of Florida's new aggravating factor placed no additional burden on petitioner. . . . .

The State's position is simply untenable. A Florida Circuit Judge relied upon Florida's new aggravating factor to sentence petitioner to death. Before 1979, the Florida death penalty statute contained no aggravating factor analogous to the one added by 1979 Fla.Laws 353. . . . The application of the new aggravating factor made it easier for the Florida judge to sentence petitioner to death, and for that reason alone was more onerous for petitioner than the sentencing procedure in place at the date of his offense . . . .

More importantly, defending an aggravating factor by reference to elements of the underlying offense is inconsistent with this Court's prior death penalty decisions.  The sole purpose of requiring a sentencing authority to balance aggravating factors against mitigating circumstances is to force the sentencer to look beyond the offense to determine whether capital punishment is warranted given the totality of the circumstances surrounding the crime.  By amending its death penalty statute, Florida changed the ground rules for judging the totality of the circumstances.  This change most definitely prejudiced petitioner.

*Justus v. Fla.*, 465 U.S. 1052, 104 S. Ct. 1332, 79 L. Ed. 2d 726 (1984) (Marshall,

J., dissenting from denial of certiorari).

The state contends that the Supreme Court's decision in *Dobbert v. Florida*,

432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977), "squarely rejected" this

claim and that it is "squarely opposed to Jennings' position."  (Resp. at 55) (citing

*Dobbert* for the proposition that "application of aggravating factor enacted after

commission of offense does not violate *ex post facto* clause").  *Dobbert* did not,

however, involve the application of an aggravating factor, but a challenge to

Florida's entire (and at the time, new) sentencing scheme, based upon the provision

for advisory juries, a parole provision, and an argument that the statute was not in

effect (due to the *Furman* decision) at the time Dobbert committed his crime.

Nothing in *Dobbert* could be read to "squarely oppose" the argument Mr. Jennings

has made here.

At the time Mr. Jennings was sentenced, the jury and judge considered the CCP

and two other aggravators.  Had Mr. Jennings been sentenced pursuant to the law

in effect at the time he committed the murder, and had the two other aggravators

been unavailable, then he could not have been sentenced to die.  Thus, the addition

of the CCP aggravator to the equation expanded the grounds on which Mr.

Jennings could be sentenced to death.  This was not a mere procedural matter

immune from the ban on ex post facto laws.  *See Weaver*, 450 U.S. at 30, 31 n.12

(defining a procedural violation as one that does not "increase the punishment" for

an offense and stating that the ex post facto clause "forbids the imposition of

punishment more severe than the punishment assigned by law when the act to be

punished occurred.").

In sum, *Combs* is an unreasonable application of federal ex post facto law as set

forth by the United States Supreme Court.  The Florida Supreme Court's reliance

on *Combs* as the basis for rejecting Mr. Jennings' claim thus also was an

unreasonable application of the same federal law.

**I.3.  <u>Claim IX: Harmless Error</u>**

Having established that retroactive reliance upon the CCP aggravator was an

unreasonable application of federal law, the question becomes whether

consideration of the aggravator constituted harmless error.  As set forth above, *see*

section G.2 and notes 22 and 23 and accompanying text, the Florida Supreme

Court's decision in *Jennings V*, fairly read, makes clear that court's view that the

death sentence would have been imposed even in the absence of the CCP

aggravator —that is, that reliance on the CCP aggravator, even if improper, was

harmless error.  The conclusion that use of the CCP aggravator was harmless error

is not contrary to or an unreasonable application of federal law as set forth by the

United States Supreme Court.  To the contrary, the conclusion is correct.

Even if *Jennings V* were not read as addressing this harmless error issue, I

would myself hold, as an alternative basis for the same decision, that the error was

harmless.

In reaching this alternative holding, I have not overlooked decisions of the

United States Supreme Court that might be read to suggest, though they do not

squarely hold, that when a death penalty aggravating factor has been invalidated,

any reweighing or harmless-error analysis must be carried out by the *state* court,

not by a federal habeas court.  The Supreme Court stated in *Richmond v. Lewis*,

506 U.S. 40, 113 S. Ct. 528, 121 L. Ed. 2d 411 (1992):

> "[O]nly constitutional harmless-error analysis or reweighing at the trial or
> appellate level suffices to guarantee that the defendant received an
> individualized sentence." Where the death sentence has been infected by a
> vague or otherwise constitutionally invalid aggravating factor, the *state*
> appellate court or some other *state* sentencer must actually perform a new
> sentencing calculus, if the sentence is to stand.

*Id.* at 49-50 (quoting *Stringer v. Black*, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed.

2d 367 (1992)) (emphasis added) (alteration in original).  That this statement was

made in the context of a federal habeas review suggests that remand to the state

courts is the appropriate means of accomplishing any reweighing, and the passage

also could be read to impose the same requirement for harmless-error analysis.

Similarly, in *Parker v. Dugger*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812

(1991), the Court held that the Florida Supreme Court had failed to conduct a

proper *Clemons* reweighing or harmless-error analysis and reversed "with

instructions to return the case to the District Court to enter an order directing the

State of Florida to initiate appropriate proceedings in state court so that Parker's

death sentence may be reconsidered in light of the entire record . . . ."  *Id.* at 322-

23.  *See also* Randy Hertz & James S. Liebman, 2 *Federal Habeas Corpus*

*Practice & Procedure* §31.3 at 1387 n.43 ("If a sentencer in a 'weighing' state

bases a death sentence on an invalid aggravating factor . . . the federal courts may

not themselves engage in either a reweighing or in harmless error analysis."); *but

see Coe v. Bell*, 161 F.3d 320, 334-35 (6th Cir. 1998) (holding that federal court

may conduct reweighing or harmless error analysis after invalidating a sentencing

aggravator).

　　Still, it is commonplace for federal courts to apply harmless error analysis in

habeas cases.  Ex post facto violations are subject to harmless error review.  That

this error involved the death penalty provides no basis for deviating from standard

and uncontroversial harmless error principles, under which federal habeas relief is

not available for ex post facto violations that were harmless beyond a reasonable

doubt, as this one was.  I conclude, as an alternative basis for rejecting the ex post

facto claim, that I am not foreclosed from performing my own harmless error

analysis, and that the error was, in fact, harmless.[26]

## I.4.  <u>Claim IX: Conclusion</u>

　　The Florida Supreme Court's holding that  retroactive application of the newly

enacted CCP aggravator did not violate the constitutional ban on ex post facto laws

was an unreasonable application of federal law as set forth by the United States

---

　　[26] As the Florida Supreme Court said, the brutal nature of this crime, the
clear presence of two other aggravators, and the absence of mitigating factors make
reliance on the CCP aggravator superfluous.  With or without that factor, the result
would have been the same.

Supreme Court.  But the Florida Supreme Court's conclusion that any improper

use of the CCP aggravator was harmless was not contrary to or an unreasonable

application of federal law.  To the contrary, the conclusion was correct.  Claim IX

is unfounded.

## J.  CLAIM X:  Automatic Aggravator

Mr. Jennings argues that his Eighth and Fourteenth Amendment rights were

violated because his death sentence relies on the felony that formed the basis of his

conviction, which he claims is an improper, automatic aggravating circumstance.

The assertion is incorrect.

### J.1.   Claim X: Procedural Background

***Trial Proceedings.***  During a Florida penalty phase proceeding, the jury

considers all evidence, determines whether aggravating and mitigating factors are

present, and weighs any such factors.  *See* §921.141, Fla. Stat.

As required by §921.151(5)(d), the jury in Mr. Jennings' case was instructed

that one aggravating circumstance that it could consider was whether "the crime

for which Bryan Frederick Jennings is to be sentenced was committed while the

defendant was engaged in the commission of or an attempt to commit the crime of

sexual battery, burglary or kidnapping." (F10 at 1699.)

***Direct Appeal.***  On direct appeal of his conviction, Mr. Jennings took issue with

the jury's consideration of this aggravator.  He argued that the aggravator did not

narrow the class of individuals eligible for a death sentence and thus gave judges

and juries unfettered discretion in determining the appropriateness of the death

penalty.  This, Mr. Jennings asserted, would lead to unconstitutionally arbitrary

and capricious decisions to impose the penalty.  (F20, Initial Brief of Appellant at

86-87.)  The Florida Supreme Court rejected the argument "without comment,"

preserving the claim for federal habeas review. *Jennings III*, 512 So. 2d at 175-76.


**J.2.   Claim X:  Analysis**

Mr. Jennings' argument that this aggravator does not narrow the class of

individuals who are eligible for the death penalty is incorrect.  The aggravator

identifies a sub-category of persons convicted of a capital felony who may be

sentenced to death.  The sub-category consists of those whose

> capital felony was committed while the defendant was engaged, or
> was an accomplice, in the commission of, or an attempt to commit, or
> flight after committing or attempting to commit, any robbery, rape,
> arson, burglary, kidnapping, or aircraft piracy or the unlawful
> throwing, placing, or discharging of a destructive device or bomb.

§921.141(5)(d).  Thus a person who commits first-degree murder in connection

with a rape, for example, may be sentenced to death, while a person who commits first-degree murder in connection with a felony not listed in the statute—drug trafficking, for example—may not, at least in the absence of other aggravating factors.  And the factor does not make imposition of the death penalty automatic, even for those who are guilty of one of the offenses listed in the statute.  Thus a person commits first-degree murder in connection with a rape need not be sentenced to death; the death penalty may be imposed on such a person only if the aggravating factors (including this one) outweigh any mitigating factors.

Reliance on this aggravating factor thus was not improper and did not contravene federal law as set forth by the United States Supreme Court.  To the contrary, the Supreme Court's decisions, and those of the Eleventh Circuit, fully support application of this factor.  *See, e.g., Proffitt v. Florida*, 428 U.S. 242, 251, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976) (holding Florida death penalty statute (which included this aggravator) constitutional on its face); *Johnson v. Dugger*, 932 F.2d 1360, 1369 (11th Cir. 1991) (upholding this aggravator).

## J.3.  Claim X: Conclusion

The Florida aggravating factor for capital felonies committed during the course of specific other offenses does not violate federal law as set forth by the United States Supreme Court.  Claim X is unfounded.

## K.  CLAIM XI:  *Caldwell*

Mr. Jennings next asserts that his Eighth and Fourteenth Amendment rights

were violated because the jury instructions unconstitutionally minimized the jury's

sense of responsibility for the sentence.  In support of this contention, Mr. Jennings

relies on *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231

(1985).  There the Supreme Court said:

> it is constitutionally impermissible for a death sentence to rest on a
> determination made by a sentencer who has been led to believe that the
> responsibility for determining the appropriateness of the defendant's death
> lies elsewhere.

Id., 472 U.S. at 328-29.  Mr. Jennings also claims that his counsel was ineffective

for not raising this issue at trial or on direct appeal.  Neither assertion warrants

habeas relief.

### K.1.   Claim XI: Procedural Background

*Trial Proceedings.*  In voir dire, the prospective jurors were told that in the

penalty phase, the jury's role would be "advisory in nature" and "not binding upon

the Court" but that "the Jury recommendation is given great weight and deference

when the Court determines what punishment is appropriate." (F2 at 7.)  Prior to

penalty phase deliberations on the sentence, the court instructed the jury that "the

final decision as to what punishment shall be imposed, is the responsibility of the Judge; however it is your duty to follow the law . . . and render to the Court an advisory sentence." (F10 at 388.) Mr. Jennings' attorney did not object to these statements. (F10 at 1703.)

***Direct Appeal.*** On direct appeal, Mr. Jennings did not raise either the *Caldwell* issue or the ineffective assistance of counsel issue.

***Postconviction Proceedings.*** Mr. Jennings raised both claims in his 1990 motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. (F23 at 84.) The Florida Supreme Court summarily denied the *Caldwell* claim, holding that it was procedurally barred because it was "raised or should have been raised on direct appeal." *Jennings IV*, 583 So. 2d at 323 n.3. The Florida Supreme Court stated generally, in addressing another ineffective assistance claim, that "the defense counsel's performance at the penalty stage was not ineffective under *Strickland*." *Id.* at 321.

***State Habeas Proceedings.*** Mr. Jennings raised both claims in his 1989 state habeas petition (F24 at 106-11), which was decided concurrently with the 1990 appeal from denial of the 3.850 motion. *See Jennings IV*, 583 So. 2d at 317. The Florida Supreme Court held that the *Caldwell* claim was procedurally barred. *Id.* at 323 n.3. Mr. Jennings raised the *Caldwell* claim in his 2003 state habeas petition

(F32 at 23), and the Florida Supreme Court denied the petition without explanation.  (Order of Florida Supreme Court, June 18, 2003, Case No. SC02-2143.)

   ***Federal Habeas Proceeding.***  Mr. Jennings has raised both the *Caldwell* and ineffective assistance claims in this proceeding.  (Pet. 100-05.)  The state argues that the Florida Supreme Court correctly concluded that both claims are procedurally barred.  (Resp. at 56-57.)  Alternatively, the state argues that the claims are meritless.  (Resp. at 57-58.)


### K.2.   Claim XI: Analysis

   Mr. Jennings' *Caldwell* claim is procedurally barred and was unfounded on the merits under the law as in effect when Mr. Jennings' conviction became final.  The United States Supreme Court's more recent decision in *Ring*, which might produce a different result, does not apply retroactively on collateral review and thus makes no difference here.

   A *Caldwell* claim is barred if not raised "on direct appeal."  *King v. Moore*, 196 F.3d 1327, 1336 (11th Cir. 1999) (agreeing with Florida Supreme Court's ruling to same effect).  Mr. Jennings failed to raise the *Caldwell* issue on direct appeal.

   Mr. Jennings asserts, however, that the claim is not procedurally barred because

the Florida Supreme Court denied his last state habeas petition without specifically asserting a procedural bar.  (Reply at 45-46.)  But when the reason for a state court decision denying a claim is ambiguous, federal courts properly apply a rebuttable presumption that "later unexplained orders . . . rejecting the same claim rest upon the same ground [as the last explained judgment]."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).  The last state decision rejecting Mr. Jennings' *Caldwell* claim relied on the procedural bar.  Mr. Jennings has not rebutted the presumption that the Florida Supreme Court rejected his later assertion of the same claim on the same procedural grounds.

Mr. Jennings also asserts that he can overcome the procedural bar because the failure to raise the *Caldwell* claim on direct appeal resulted from ineffective assistance of counsel.  (Pet. at 105.)  But under the law as it existed at that time, the *Caldwell* claim was unfounded.  As the Eleventh Circuit has repeatedly held, failure to anticipate a change in the law is not constitutionally ineffective.  Thus, for example, in *United States v. Ardley*, 273 F.3d 991 (11th Cir. 2001), the defendant's attorney failed to anticipate the decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), one of the precursors to *Ring*.  The Eleventh Circuit held that the failure to preserve this issue was not ineffective.  *Ardley*, 273 F.3d at 993.  The court said, "[i]n this circuit, we have a

wall of binding precedent that shuts out any contention that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel." *Id*. Other cases so holding include *Poole v. United States*, 832 F.2d 561, 565 (11th Cir. 1987), and *Funchess v. Wainwright*, 772 F.2d 683, 691 (11th Cir. 1985).  In *Funchess*, the court said that "failure of counsel to anticipate that an otherwise valid jury instruction would later be deemed improper by the state judiciary [one year later] does not constitute ineffective assistance of counsel."

Mr. Jennings thus plainly has not demonstrated ineffective assistance of counsel, and he has not overcome the procedural bar.

The *Caldwell* claim also fails on the merits, at least based on the law as it existed at the time.  Prior to *Ring*, Florida's capital sentencing scheme, under which juries rendered advisory verdicts and judges made the final determination whether to impose the death penalty, had been held constitutional.  *See, e.g., Proffitt v. Florida*, 428 U.S. 242, 251, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976). While that sentencing scheme was in place, the jury could properly be instructed on the respective roles of the judge and jury in determining the sentence.  *See, e.g., Romano v. Oklahoma*, 512 U.S. 1, 8, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994) ("To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.").

Applying this principle to the Florida sentencing scheme, the Eleventh Circuit had

said:

> [I]t is clear that the references to and descriptions of the jury's
> sentencing verdict in this case as an advisory one, as a
> recommendation to the judge, and of the judge as the final sentencing
> authority are not error under *Caldwell* . . . because they accurately
> characterize the jury's and judge's sentencing roles under Florida law.

*Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997)*; see also Johnston v.

Singletary*, 162 F.3d 630, 643 (11th Cir. 1998) (rejecting *Caldwell* claim and

related ineffective assistance claim because remarks to the jury "accurately

described the jury's advisory role during a capital trial under Florida law").

In the case at bar, as in *Davis* and *Johnston*, the jury instructions accurately

explained the jury's role under Florida law as then in effect.

To be sure, the United States Supreme Court's more recent decision in *Ring*

calls into question the validity of Florida's allocation of roles between judge and

jury.  If, under *Ring*, the jury's findings on aggravating and mitigating factors and

their weighing must be final, then, under *Caldwell*, the jury cannot be told

otherwise.  But, as set forth above, the Supreme Court has held *Ring* not

retroactively applicable on collateral review.  *See Schriro v. Summerlin*, 542 U.S.

348, 124 S. Ct. 2519, 2526, 159 L. Ed. 2d 442 (2004) ("*Ring* announced a new

procedural rule that does not apply retroactively to cases already final on direct review."). If, as *Schriro* makes clear, Mr. Jennings cannot invoke *Ring* in a direct challenge to the use of an advisory jury, then even more clearly he cannot invoke *Caldwell* to mount the same challenge indirectly.

### K.3.   Claim XI: Conclusion

Mr. Jennings' *Caldwell* claim is procedurally barred.  And even if the merits could be reached, the claim would remain unfounded, because the instruction explaining that the jury's role was advisory was an accurate statement of Florida law as then in effect.  The Supreme Court's more recent holding in *Ring*, which calls into question the constitutionality of giving final decision making authority to the judge rather than the jury, does not apply retroactively to cases on collateral review and thus affords Mr. Jennings no right to relief.  The failure of Mr. Jennings' attorney to anticipate *Ring* and thus to raise a then-unfounded *Caldwell* claim on direct review was not constitutionally ineffective.  Claim XI is unfounded.

### L.  CLAIM XII:  Burden of Proof

Mr. Jennings argues that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated because, he says, the court instructed the jury, in effect, to

recommend a death sentence unless the mitigating circumstances outweighed the

aggravating circumstances.  This instruction, Mr. Jennings says, improperly shifts

to him the burden of proof on this issue.  Mr. Jennings says his attorney was

ineffective for not objecting to the instructions or raising this issue on direct

appeal, thus excusing any procedural default.

### L.1.   Claim XII: Procedural Background

*Trial Proceedings.*  During the penalty phase, the court instructed the jury that

it should determine "whether sufficient aggravating circumstances exist to justify

the imposition of the death penalty and whether sufficient mitigating circumstances

exist to outweigh any aggravating circumstances found to exist."  (F10 at 1698-

99.)  The court also instructed the jury that aggravating circumstances were

"limited"; that mitigating factors were "unlimited" and could include "[a]ny other

aspect of the defendant's character or record, and any other circumstance of the

offense"; and that if the "aggravating circumstances do not justify the death

penalty, your advisory sentence should be one of life imprisonment."  (F10 at

1699-1700.)  Mr. Jennings' attorney did not object to these instructions.  (F10 at

1703.)

*Direct Appeal.*  Mr. Jennings claims that he raised this issue on direct appeal in

Point XVI of his Initial Brief.  (Pet. at 107.)  Mr. Jennings' Point XVI, entitled

"The Florida Capital Sentencing Statute is Unconstitutional on its Face and as Applied," summarized previous challenges to the Florida capital sentencing scheme that the brief acknowledged had already been "specifically or impliedly rejected" by the Florida Supreme Court.  (F20 at 98-101.)  Mr. Jennings' direct appeal did *not* argue, as the claim in this court does, that the penalty phase instructions were unconstitutional because they imposed on him the burden of proving the inappropriateness of a death sentence.  The Florida Supreme Court rejected Point XVI "without comment."  *Jennings III*, 512 So. 2d at 176.

   *Postconviction Proceedings.*  Mr. Jennings raised the claim that the jury instructions improperly shifted the burden of proof in postconviction proceedings.  (F23 at 83.)  He did not, however, raise the related ineffective assistance claim.  The Florida Supreme Court "summarily reject[ed]" the burden of proof claim because it was "raised or should have been raised on direct appeal" and therefore was "procedurally barred."  *Jennings IV*, 583 So. 2d at 321-22,  323 n.3.

   *State Habeas Proceedings.*  Mr. Jennings raised the burden of proof and ineffective assistance claims in his 1990 state habeas petition (F24 at 64-70), which was decided with his 1990 appeal from denial of his Rule 3.850 motion.  *See Jennings IV*, 583 So. 2d at 317.  The Florida Supreme Court held the claims procedurally barred.  *Id.* at 323 n.3.  Mr. Jennings also raised the claims in his 2003

state habeas petition.  (F32 at 27.)  The Florida Supreme Court denied the claims without explanation.  (Order of Florida Supreme Court, June 18, 2003, Case No. SC02-2143.)

*Federal Habeas Proceeding.*  Mr. Jennings raises both the burden of proof and ineffective assistance claims in this proceeding.  (Pet. at 106-09.)  The state argues that the claims are procedurally barred, as the Florida Supreme Court has held. (Resp. at 58.)  Further, the state argues that the claims are unfounded because the United States Supreme Court has upheld similar jury instructions.  (Pet. at 59.)

### L.2.   Claim XII:  Analysis

Mr. Jennings' burden of proof claim is procedurally barred because no objection was made at trial, *see Griffin v. State*, 866 So. 2d 1, 14 (Fla. 2003) ("counsel's failure to object to the [jury] instructions at trial foreclosed Griffin from raising these claims on appeal"), and because in any event the issue was not raised on direct appeal.  *See Griffin*, 866 So. 2d at 14 ("substantive challenges to jury instructions should be raised on direct appeal"); *Turner v. Dugger,* 614 So. 2d 1075, 1079 (Fla. 1992) (defendant's "substantive claims regarding 'burden-shifting' [under Florida's capital-sentencing scheme] are procedurally barred because they should have been raised on direct appeal.").  *See also Waldrop v. Jones*, 77 F.3d 1308, 1314 (11th Cir. 1996) (relying on the relevant state law to

determine when a jury instruction claim should have been raised).[27]

Mr. Jennings asserts, however, that the procedural default resulted from ineffective assistance of counsel.  The Florida Supreme Court rejected the contention, and its decision was neither contrary to, nor an unreasonable application of, governing federal law.  Moreover, even as an original matter, I would reach the same conclusion.  The jury instructions made clear that only specified aggravators could be considered, that anything could be considered in mitigation, and that death could be recommended only if the specified aggravators warranted imposition of the death penalty and were not outweighed by mitigating factors.  This is, in substance, an accurate description of the Florida scheme explicitly upheld by the United States Supreme Court in *Proffitt*.  And federal decisions addressing instructions just like this one have concluded they do not improperly place the burden of proof on the defendant.  *See Ford v. Strickland*, 696 F.2d 804, 817-18 (11th Cir. 1983); *Scott v. Dugger*, 686 F. Supp. 1488, 1509 (S.D. Fla. 1988) (following *Ford*).[28]  The failure of Mr. Jennings' attorney to raise this

---

[27] Point XVI in Mr. Jennings' direct appeal was not sufficient to overcome the procedural bar.  Point XVI focused on the alleged unconstitutionality of Florida's capital sentencing statute, not on the jury instructions and their allegedly improper allocation of the burden of proof.

[28] Other courts have upheld similar instructions.  *See Boyde v. California*, 494 U.S. 370, 374, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990) (upholding jury instructions that included a "catch-all" mitigating factor and said that "[i]f you

issue in the face of this case law did not constitute ineffective assistance.

### L.3.   Claim XII: Conclusion

Mr. Jennings' claim that the jury instructions on weighing aggravating and

mitigating factors improperly imposed the burden of proof on him is procedurally

barred because not asserted at trial or on direct appeal.  His attorney's failure to

raise the issue did not constitute ineffective assistance.  And under the law of the

circuit, the instructions were not improper.  Claim XII is unfounded.

## M.  CLAIM XIII:  Independent Weighing

Mr. Jennings argues that his Eighth and Fourteenth Amendment rights were

violated because the judge, in determining Mr. Jennings' sentence, allegedly failed

to perform his own independent weighing of the aggravating and mitigating

circumstances as required by the governing statute.[29]  Mr. Jennings asserts the trial

---

conclude that the aggravating circumstances outweigh the mitigating
circumstances, you shall impose a sentence of death"); *Blystone v. Pennsylvania,*
494 U.S. 299, 305, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990) (upholding death
penalty statute that included a "catchall" mitigation category and allowed death
sentence only based on "a determination that the aggravating circumstances
outweigh the mitigating circumstances").

[29] The statute provides:

Notwithstanding the recommendation of a majority of the jury, the
court, after weighing the aggravating and mitigating circumstances,
shall enter a sentence of life imprisonment or death, but if the court

judge relied instead on findings of fact from Mr. Jennings' first trial.

### M.1.  Claim XIII: Procedural Background

***Trial Proceedings.***  During the sentencing hearing, the judge said:

> [O]ne of my obligations . . . is to review the aggravating circumstances and
> the mitigating circumstances to see if they exist and to weigh one against
> another.  I have done that.  The law also requires that I put those findings,
> that analysis, in writing.  I have done that."

(F11 at 1823.)  In the ruling delivered orally (F10 at 1822-33), as well in the

sentencing order (F19 at 3459-64), the judge explained his findings with respect to

statutory aggravating and mitigating factors and with respect to possible

nonstatutory mitigating factors.  As discussed above, the judge found three

---

imposes a sentence of death, it shall set forth in writing its findings
upon which the sentence of death is based as to the facts:

    (a) That sufficient aggravating circumstances exist as
    enumerated in subsection (5), and

    (b) That there are sufficient mitigating circumstances to
    outweigh the aggravating circumstances.

In each case in which the court imposes the death sentence, the
determination of the court shall be supported by specific written
findings of fact based upon the circumstances in subsections (5)
[aggravating factors] and (6) [mitigating factors] and upon the records
of the trial and the sentencing proceedings.

§921.141(3), Fla. Stat.

statutory aggravators and no mitigators.  (F19 at 3463.)  Significant portions of the findings were copied from the original sentencing order entered after the first trial.

**Direct Appeal.**  On direct appeal, Mr. Jennings asserted that the death penalty was not justified because "additional mitigating circumstances should have been found, and the mitigating circumstances outweigh the aggravating circumstances." (F20 at 76.) This was a challenge to the judge's findings but was different from the claim now asserted in the case at bar.  The Florida Supreme Court upheld the judge's findings.  *Jennings III*, 512 So. 2d at 175-77.

**Postconviction Proceedings.**  Mr. Jennings raised this claim in postconviction proceedings.  (F23, Initial Brief of Appellant at 64-68.)  The Florida Supreme Court "summarily reject[ed]" the claim because it either was "raised or should have been raised on direct appeal" and therefore was "procedurally barred." *Jennings IV*, 583 So. 2d at 321-22,  323 n.3.

**State Habeas Proceedings.**  Mr. Jennings raised this claim in his 1990 state habeas petition (F24 at 70-78), which was decided with his 1990 appeal from denial of his 3.850 motion.  *See Jennings IV*, 583 So. 2d at 317.  The Florida Supreme Court held that the claim was procedurally barred.  *Id.* at 323 n.3.  Mr. Jennings did not raise this claim in his 2003 state habeas petition.

**Federal Habeas Proceedings.**  Mr. Jennings has raised the claim here.  (Pet. at

110-116.)  The state responds by quoting from the Florida Supreme Court's

opinion in *Jennings III* that appeared to find no error.  The state also contends that

this claim raises only issues of state law that are not the proper subject of federal

habeas review.  (Resp. at 59-61.)

## M.2.  Claim XIII: Analysis

This claim is procedurally barred because it was not raised on direct appeal.

The claim also is unfounded on the merits.  Although the sentencing judge copied

significant portions of his findings from the original sentencing order, that does not

mean the judge did not comply with his duty to conduct an "independent review of

the evidence" and develop "his own findings regarding aggravating and mitigating

circumstances."  *Lambrix v. Singletary*, 520 U.S. 518, 535, 117 S. Ct. 1517, 137 L.

Ed. 2d 771 (1997).  The judge explicitly indicated on the record that he had made

his own evaluation and findings as announced both orally and in his written order.

Nothing in the record supports any contrary assertion.[30]  To be sure, the two

_____

[30] The Florida Supreme Court has repeatedly addressed similar claims.
*Compare Patterson v. State*, 513 So. 2d 1257, 1261 (Fla. 1987) (finding that the
judge failed to make independent evaluation of the evidence when the state
attorney prepared the sentencing order and the judge did not specifically articulate
his findings of aggravating or mitigating circumstances during the sentencing
hearing) *with Walton v. State*, 847 So. 2d 438, 447 (Fla. 2003) (rejecting claim
based solely on the fact that "substantial portions of the final sentencing order and
the [state's] sentencing memoranda" were "identical"); *Morton v. State*, 789 So. 2d
324, 334 (Fla. 2001) ("although the resentencing judge did utilize substantial
portions of the original judge's sentencing order, there were also several significant

sentencing orders are very similar.  But so was the evidence.  It is perhaps to be expected that successive sentencing hearings with nearly identical records would lead to nearly identical findings.  And nothing requires a judge in these circumstances to start from scratch rather than with an earlier draft.  The critical judicial function is evaluation and fact finding, not drafting.

Moreover, while these orders are very close, they are not identical, suggesting that the judge did indeed make an independent review, just as he said he did.  Thus, for example, in outlining the aggravating circumstances, the judge omitted a reference to the victim's height and weight.  (*Compare* F17 at 3018, paragraph 3 *with* F19 at 3461.)  In discussing mitigating factors, the judge deleted a line from the original order that based a finding of an absence of extreme mental distress on the testimony of Dr. J. Lloyd Wilder.  (*Compare* F17 at 3019, paragraph 5 *with* F19 at 3462.)  In determining that Mr. Jennings' drinking was not a mitigating factor, the new order omitted a reference in the original to testimony of Dr. Wilder and Dr. Michael Gutman.  (*Compare* F17 at 3019, paragraph 6 *with* F19 at 3462.)

---

differences between the two orders, demonstrating that the resentencing judge performed an independent weighing"); *and Nibert v. State*, 508 So. 2d 1, 3-4 (Fla. 1987) (rejecting challenge where judge did not prepare the written findings but "made the requisite findings at the sentencing hearing.").  To the extent based on state law, Mr. Jennings' contention is of course immune from federal habeas review.  And in any event, the order in the case at bar would pass muster under these decisions.

While both orders discuss Mr. Jennings' age at the time of the crime, the new order did not include his date of birth.  (*Compare* F17 at 3018, paragraph 7 *with* F19 at 3462.)  With respect to nonstatutory mitigating factors, the judge deleted the line in the original order saying Mr. Jennings had recounted the details of the incident in his confession.  (*Compare* F17 at 3020, paragraph 8(d) *with* F19 at 3463.)  Finally, the entire paragraph in the original order discussing whether Mr. Jennings was a mentally disordered sex offender was deleted.  (*Compare* F17 at 3020, paragraph 8(e) *with* F19 at 3463.)

These specific changes suggest that the judge independently reviewed the aggravating and mitigating factors and made his own determinations.  More importantly, the judge orally announced the critical findings regarding aggravating and mitigating factors and said he had weighed those factors.  (F11 at 1823.)  Mr. Jennings' assertion that the judge did not do so draws no support from this record.

## M.3.  Claim XIII: Conclusion

Mr. Jennings' claim that the judge did not independently evaluate and weigh the aggravating and mitigating circumstances is both procedurally defaulted and factually incorrect.  Claim XIII is unfounded.

## N.  CLAIM XIV:  Mitigation

Mr. Jennings argues that his Eighth and Fourteenth amendment rights were violated because the sentencing court failed to give adequate consideration to the evidence of mitigating circumstances. This claim is unfounded on the merits.

### N.1.   Claim XIV: Procedural Background

***Trial Proceedings.***   During penalty phase proceedings, the defense introduced evidence of potential mitigating circumstances, and the attorneys addressed the evidence in their arguments. (F10 at 1518-1637 & 1662-98.) The court instructed the jury to consider the statutory mitigating factors as well as "any evidence presented at trial or the sentencing proceeding in mitigation of the defendant's sentence." (F10 at 1700.) The jury recommended death. (F10 at 1706.) In the sentencing order (F19 at 3459-64), the court explained his findings for each of the statutory factors and for nonstatutory mitigating factors including Mr. Jennings' lack of a father figure, emotional problems, personality conflict with his mother and aunt, and history of alcohol and drug abuse. The court found there was "nothing in the Defendant's personality, character, background, or the circumstances of the offense to justify finding any non-statutory Mitigating Circumstances." (F19 at 3463.)

***Direct Appeal.***   Mr. Jennings raised this issue on direct appeal. (F20, Initial Brief of Appellant at 76-97.) The Florida Supreme Court stated that "no error"

existed in the court's finding of an absence of mitigating circumstances.  *Jennings III*, 512 So. 2d at 176.

**Postconviction Proceedings.**  Mr. Jennings raised this claim in postconviction proceedings.  (F23, Initial Brief of Appellant at 77-82.) The Florida Supreme Court "summarily reject[ed]" the claim because it either was "raised or should have been raised on direct appeal" and therefore was "procedurally barred."  *Jennings IV*, 583 So. 2d at 321-22,  323 n.3.

**State Habeas Proceedings.**  Mr. Jennings raised this claim in his 1990 state habeas petition (F24 at 37-50), which was decided with his 1990 appeal from denial of his 3.850 motion.  *See Jennings IV*, 583 So. 2d at 317.  The Florida Supreme Court held that the claim was procedurally barred.  *Id.* at 323 n.3.  Mr. Jennings did not raise this claim in his 2003 state habeas petition.

**Federal Habeas Proceedings.**  Mr. Jennings contends here that the sentencing court did not appropriately consider all the evidence proffered in mitigation, specifically citing Mr. Jennings' alleged drug and alcohol intoxication, his mental and emotional disturbance, and the improvement made in his psychiatric condition. (Pet. at 116-22.)  The state asserts that the claim is merely a "continuing complaint" about the state courts' resolution of this issue and that, in any event, the state court's decision was not contrary to, or an unreasonable application of,

federal law.  (Resp. at 61-62.)

### N.2.   Claim XIV: Analysis

Mr. Jennings' claim fails because the Florida Supreme Court's conclusion that the trial court did not err in its evaluation of mitigating circumstances was not contrary to, or an unreasonable application of, federal law and was not based on an unreasonable determination of the facts.

While a sentencing court must consider all mitigating circumstances, *see Hitchcock v. Dugger*, 481 U.S. 393, 394, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987), the court has broad discretion with respect to the weight they should be given.  A sentencing court thus may appropriately choose to give an allegedly mitigating factor little or no weight.  *See Dobbert v. Strickland*, 718 F.2d 1518, 1524 (11th Cir. 1983) (whether a circumstance "is mitigating depends on the evidence in the case as a whole and the views of the sentencing . . . judges").[31]

When Mr. Jennings was sentenced, a sentencing judge was required to "set forth explicitly his findings as to only the *statutory* aggravating and mitigating circumstances."  *Parker v. Dugger*, 495 U.S. 308, 317, 111 S. Ct. 731, 112 L. Ed.

---

[31] *See also Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000) ("while a proffered mitigating factor . . . must be considered," the sentencing judge may determine "it is entitled to no weight."); *Nibert v. State*, 508 So. 2d 1, 4 (Fla. 1987) ("[i]t is within the trial judge's discretion to determine whether sufficient evidence exists of a particular mitigating circumstance and, if so, the weight to be given it.").

2d 812 (1991) (emphasis added).  Reviewing courts inferred that a sentencing

judge evaluated nonstatutory mitigating factors from the circumstances of the

penalty phase proceedings and from the sentencing order.  *See Daugherty v.*

*Dugger*, 839 F.2d 1426, 1432 (11th Cir. 1988) (inferring that the sentencing court

had considered nonstatutory mitigating factors when both parties argued such

factors during the penalty hearing, when the court instructed the sentencing jury to

consider them, and when the court's sentencing order stated that he had considered

"all the evidence"); *Strickland*, 718 F.2d at 1524 (finding that the statement in the

sentencing order that "there are no mitigating circumstances existing—either

statutory or otherwise—which outweigh any aggravating circumstances" was

"indicative of the sentencing judge's consideration of nonstatutory mitigating

evidence.").

Nothing in this record suggests that the sentencing court failed to consider all

mitigating factors.  To the contrary, the court's consideration of all mitigating

circumstances can be inferred from the conduct of the penalty phase and from the

sentencing order, as in *Daugherty* and *Dobbert*.  Mr. Jennings' friends, relatives,

and mental health experts testified with respect to the circumstances of his life and

his mental condition, and the attorneys addressed the evidence in argument.  (F10

at 1518-1637, 1662-1698.)  As in *Daugherty*, the court instructed the jury to

consider statutory and nonstatutory mitigating factors, including "any evidence

presented." (F10 at 1700.) The court's sentencing order addressed each of the

possible statutory mitigating factors, four nonstatutory mitigating factors, and their

absence in Mr. Jennings' case. (F19 at 3461-63.) Like the order upheld in

*Dobbert*, the sentencing order said the court had heard "all the evidence" and found

nothing to justify "any non-statutory Mitigating Circumstance." (F19 at 3459-63.)

　　In sum, nothing suggests the court failed to consider any mitigating

circumstance.[32]

### N.3.　Claim XIV: Conclusion

　　The Florida Supreme Court's rejection of Mr. Jennings' challenge to the trial

court's consideration of mitigation was not contrary to, nor an unreasonable

application of, federal law. Nor was it based on an unreasonable determination of

the facts. To the contrary, the decision was correct. Claim XIV is unfounded.

---

　　[32] Long after Mr. Jennings was sentenced, the Florida Supreme Court
imposed a requirement that "a sentencing court must expressly evaluate in its
written order each mitigating circumstance proposed by the defendant to determine
whether it is supported by the evidence and whether, in the case of nonstatutory
factors, it is truly of a mitigating nature." *Campbell v. State*, 571 So. 2d 415, 419
(Fla. 1990). The court said this mandate to address "all the mitigating material
referred to during the penalty phase" was "only to be applied prospectively."
*Rivera v. State*, 859 So. 2d 495, 503 n.4 (Fla. 2003). No such requirement existed
when Mr. Jennings was sentenced, and failure to comply with such a state
requirement would provide no basis for federal habeas relief in any event.

## O.  CLAIM XV:  Mental Health Experts

Mr. Jennings argues that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated because the mental health experts, in making an evaluation of his mental condition, were not provided with essential information, specifically about his alleged intoxication on the night of the offense.

### O.1.   Claim XV: Procedural Background

*Trial Proceedings.*  During the penalty phase, all four mental health experts (two for the state and two for the defense) testified that Mr. Jennings was intoxicated at the time of the offense.  Dr. Elizabeth McMahon, a defense expert, testified that Mr. Jennings told her about his "excessive consumption of alcohol" (F9 at 1459) and that "[h]e had been drinking, I believe, since early in the evening until about five o'clock in the morning" prior to the offense.  (F9 at 1475.)  Dr. Michael Gutman, Mr. Jennings' other expert, said Mr. Jennings "had been home on a [military] leave, and there had been drinking and drug taking." (F9 at 1367.) Both defense experts found that Mr. Jennings was capable of forming specific intent at the time of the murder.  (F9 at 1373-74, 1462-63.)  The State's experts, Drs. Burton Podnos and J. Lloyd Wilder, testified that they had been informed of Mr. Jennings' alcohol use and had considered it in developing their opinions that

he was capable of forming the specific intent necessary for premeditated murder. (F10 at 1519, 1535, 1570, 1577.)  The court found that Mr. Jennings' intoxication did not impact the sentence and found no mitigating factors.  (F19 at 3462-63.)

*Direct Appeal.*  Mr. Jennings did not raise this issue on direct appeal.

*Postconviction Proceedings.*  Mr. Jennings raised this issue in his Rule 3.850 motion.  (F23, Initial Brief of Appellant at 40-46.)  The Florida Supreme Court "summarily rejected the claim," agreeing with the trial court "that the mental health experts had adequate information as to Jennings' alcohol consumption the night of the murder and that the additional evidence of intoxication would have been merely cumulative." *Jennings IV*, 583 So. 2d at 322.

*State Habeas Proceedings.*  Mr. Jennings did not raise this claim in his 1990 or 2003 state habeas petitions.

*Federal Habeas Proceedings.*  In this proceeding, Mr. Jennings alleges that he received constitutionally deficient assistance of mental health experts.  He asserts that although he was provided two qualified mental health experts, they were not provided adequate knowledge of the "facts regarding Mr. Jennings' alcohol intake on the night of the offense," including information from Judy Slocum, Annis Music, Patrick Clawson, and Floyd Canada,[33] as well as evidence to impeach

_____

[33] These four individuals purportedly had information that Mr. Jennings was drinking heavily during the hours prior to the offense.  The specific testimony that

Clarence Muszynski.[34]  (Pet. at 123-27.)  Mr. Jennings also quotes Drs. Henry Dee

and Peter Macaluso, two other mental health experts who were subsequently given

the evidence of these four individuals and who opined that Mr. Jennings was too

intoxicated to form specific intent.  (Pet. at 125-27.)  The state responds by quoting

the Florida Supreme Court's statement in *Jennings IV* that the evaluations were

"both complete and adequate" because the "additional evidence of intoxication

would have been merely cumulative."  (Resp. at 62-63.)  The state also says the

Florida Supreme Court's resolution of this issue was not an unreasonable

application of federal law.

### O.2.   Claim XV: Analysis

In *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), the

Court held that in certain proceedings in which a defendant's mental health is at

issue—including in the penalty phase of a capital trial—a defendant has a

constitutional right to the assistance of an appropriate mental health expert, and

---

they might have offered is discussed above.  *See supra* Part A.2.

[34] While Mr. Jennings' counsel did impeach Mr. Muszynski with motions
that Mr. Muszynski had filed, in which he claimed to be insane at the time of his
offense and of his trial, the court did not permit the motions themselves to be
admitted into evidence.  (F5 at 657-78, *supra* Part III.C.1.)  Admission of those
documents would have been unrelated to Mr. Jennings' level of intoxication at the
time of the offense, beyond generally questioning the credibility of Mr. Muszynski
and his testimony.

that for an indigent defendant, such an expert must be provided at public expense.

Mr. Jennings' was provided two competent mental health experts.  This easily met

the requirements of *Ake*.  *See Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir.

2004) (holding that *Ake* is violated only when a court denies a timely request for an

expert, denial of the request is unreasonable, and the denial renders the trial

"fundamentally unfair").

In asserting the contrary, Mr. Jennings does not assert that he was entitled to

more than two mental health experts, or that these experts lacked the necessary

qualifications.  His claim, instead, is that the experts were not provided the facts

regarding the extent of his intoxication.  The Florida Supreme Court rejected this

claim not based on any disagreement with the proposition that a defendant has a

right to the assistance of appropriate experts, but on the grounds that Mr. Jennings'

two experts knew the facts, and that providing the additional information on which

Mr. Jennings now focuses would have been merely cumulative.

The Florida Supreme Court's resolution of this issue fully accorded with

governing federal law and was not based on an unreasonable determination of the

facts.  Mr. Jennings is not entitled to relief on this claim.

### O.3.   Claim XV: Conclusion

The state satisfied its obligation under *Ake* to provide Mr. Jennings at public

expense the assistance of appropriate mental health experts.  The Florida Supreme Court's determination that the experts were provided the relevant facts and that the additional evidence on which Mr. Jennings now relies would have been cumulative was not an unreasonable determination of the facts.  Nor was that court's decision on this issue contrary to or an unreasonable application of federal law.  Claim XV is unfounded.

## P.  CLAIM XVI:  Double Jeopardy

Finally, Mr. Jennings argues that his Fifth Amendment right not to be subject to double jeopardy was violated because the CCP aggravator was *not* held applicable in his first sentencing proceeding but *was* applied in the sentencing proceeding now under review.

### P.1.   Claim XVI: Procedural Background

***Trial Proceedings.***  In the trial that led to the conviction and sentence now under review, the jury voted 11 to one in favor of the death sentence.  (F10 at 1706.)  The court imposed the sentence based on three aggravators, including CCP. (F11 at 1831-32.)  When Mr. Jennings was first sentenced to death following his initial trial, the CCP factor was not applied.  That conviction and sentence were later vacated.

***Direct Appeal.*** Mr. Jennings raised this issue on direct appeal. (F20, Initial Brief of Appellant at 82-83.) While the Florida Supreme Court did not specifically address the double jeopardy aspect of the claim, it did state that the trial court's determination that the "murder was committed in a cold, calculated and premeditated manner" was "fully support[ed]" by the record. *Jennings III*, 512 So. 2d at 176.

***State Habeas Proceedings.*** Mr. Jennings raised this issue in his 2003 state habeas petition. (F32 at 11, 25.) The Florida Supreme Court denied the claim without explanation. (Order of Florida Supreme Court, June 18, 2003, Case No. SC02-2143.)

***Federal Habeas Proceedings.*** In this proceeding, Mr. Jennings asserts that application of the CCP aggravator violated the double jeopardy clause. (Pet. at 127-130.) Mr. Jennings concedes that *Poland v. Arizona*, 476 U.S. 147, 106 S. Ct. 1749, 90 L. Ed. 2d 123 (1986), was to the contrary, but asserts that *Poland* was effectively overruled by *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). (Pet. at 129-30.) The state responds that the claim is barred by a "triple layer of procedural default" and by the fact that *Ring* does not apply retroactively to cases on collateral review. (Resp. at 63.)

## P.2.   Claim XVI: Analysis

The United States Supreme Court has made clear that there is "no double jeopardy bar in retrying a defendant who has succeeded in overturning his conviction" unless the reversal was "on the ground that the evidence was insufficient to convict." *Bullington v. Missouri*, 451 U.S. 430, 442, 101 S. Ct. 1852, 68 L. Ed. 2d 270 (1981).  If convicted again, a defendant "constitutionally may be subjected to whatever punishment is lawful, subject only to the limitation that he receive credit for time served." *Id.*

The Supreme Court applied this principle to death penalty aggravators in *Poland v. Arizona*, 476 U.S. 147, 155-56, 106 S. Ct. 1749, 90 L. Ed. 2d 123, 132 (1986).  There, a jury convicted the defendants of first degree murder.  The court sentenced them to death but did not apply the state's pecuniary gain aggravator.  They appealed, and their convictions were reversed.  On remand, they were convicted again.  The trial court again imposed the death penalty, this time based in part of the pecuniary gain aggravator.  The United States Supreme Court held that use of this aggravator following the retrial did not violate the double jeopardy clause.

*Poland* is squarely applicable and controlling in the case at bar.  Just as the failure to invoke the pecuniary gain aggravator following the first trial in *Poland* did not bar its use following the retrial, so also the failure to invoke the CCP

aggravator following the first trial here did not bar its use following the retrial.

Mr. Jennings asserts, however, that *Ring* effectively overruled *Poland*. The argument fails for four reasons, each of which would be sufficient standing alone to defeat Mr. Jennings' claim.

First, *Ring* did not overrule *Poland* because the cases deal with different issues. *Ring* addresses the identity of the fact finder and holds that, in specified circumstances, the fact finder must be the jury, not the court. *Poland*, in contrast, deals with the double jeopardy effect of a finding incorporated into a judgment that is later vacated. For purposes of the *Poland* rule, it matters not whether the fact finder is the court or jury; the same rules apply either way.

Second, *Ring* was decided after Mr. Jennings' conviction was final and does not apply retroactively on collateral review. *See supra* Part F.1.

Third, even if these conclusions were incorrect (and they are not), habeas relief still would be unavailable, because, at the least, the Florida Supreme Court's ruling on this issue was not contrary to nor an unreasonable application of federal law.

And finally, improper reliance on the CCP aggravator was, in any event, harmless error. *See supra* Part G.2.

For all of these reasons, Mr. Jennings is not entitled to relief on this claim.

**P.3.   <u>Claim XVI: Conclusion</u>**

2em

The Florida Supreme Court's rejection of Mr. Jennings' double jeopardy claim was plainly correct. The decision was not contrary to or an unreasonable application of federal law as set forth by the United States Supreme Court. The decision was not based on an unreasonable determination of the facts. Claim XVI is unfounded.

## V. CONCLUSION

For these reasons,

IT IS ORDERED:

The petition for writ of habeas corpus is DENIED.

SO ORDERED this 29th day of September, 2005.

s/Robert L. Hinkle
Chief United States District Judge